Steven Roy HARPER, Petitioner,

v.

Gary GRAMMER, Warden, Respondent.

No. CV83–L–786.

United States District Court,
D. Nebraska.

Feb. 24, 1987.

Vincent M. Powers, Lincoln, Neb., for petitioner.

Robert Spire, Atty. Gen., Lincoln, Neb., for respondent.

## MEMORANDUM OF DECISION

URBOM, District Judge.

Steven Roy Harper was convicted of two counts of murder in the first degree and three counts of poisoning with intent to kill, based upon evidence of a poisoning incident. He was sentenced to death by electrocution. His petition for a writ of habeas corpus is before this court now. The United States Magistrate David L. Piester's recommendation on each of the issues has been received and considered, as well as the entire record in the case, as it was made at the time of the trial in the District Court of Douglas County, Nebraska, the post-conviction proceeding in that court, and two appeals to the Supreme Court of Nebraska. I shall consider the individual claims in the order in which they were stated in the amended petition for writ of habeas corpus, using the same paragraph numbers that the amended petition used.

No issue of exhaustion of state remedies has been raised as to any claim, unless it is hereafter discussed with respect to the particular claim.

## CLAIM 13A—STATEMENTS TAKEN FROM THE PETITIONER

The magistrate's report and recommendation accurately describes the factual situation at page 9:

"Petitioner was arrested on October 13, 1978, in connection with the deaths of two persons and the illness of three others as a result of poisoning. After a pretrial suppression hearing, the judge recognized that statements taken from the petitioner on October 13, 1978, and on January 8, 1979, were obtained in violation of *Miranda* and were therefore inadmissible in the state's case-in-chief, although they would be admissible as impeachment should the petitioner testi-fy at trial. The judge found that both statements, although taken in violation of *Miranda,* were freely and voluntarily given by the petitioner who had full possession of all his faculties under circumstances which would enhance the reliability and truthfulness of the statements. (Criminal docket entry dated August 31, 1979, Transcript, Volume I)."

The magistrate's report and recommendation continues:

"The petitioner asserts that the trial court used the wrong standard in finding the confessions voluntary and failed to make factual findings underlying its ruling in that regard. He also asserts that the trial court failed to address the Sixth Amendment violations present in the circumstances of both confessions, and failed to identify and find inadmissible the identity of the chemical poison which was the "fruit" of the tainted statement of January 8."

Whatever standard was used by the state trial judge and the Supreme Court of Nebraska, the standard which must be applied now in this court is stated in *Mincey v. Arizona,* 437 U.S. 385, 397–98, 98 S.Ct. 2408, 2416, 57 L.Ed.2d 290 (1978):

"Statements made by a defendant in circumstances violating the strictures of *Miranda v. Arizona,* [384 U.S. 436, 86 S.Ct. 1602] *supra,* are admissible for impeachment if their 'trustworthiness ... satisfies legal standards.' *Harris v. New York, supra,* [401 U.S. 222] at 224 [91 S.Ct. 643, 645, 28 L.Ed.2d 1]; *Oregon v. Hass, supra,* [420 U.S. 714] at 722 [95 S.Ct. 1215, 1220, 43 L.Ed.2d 570]. But *any* criminal trial use against a defendant of his *involuntary* statement is a denial of due process of law 'even though there is ample evidence aside from the confession to support the conviction.' ... If, therefore, Mincey's statements to Detective Hust were not 'the product of a rational intellect and a free will,' ... his conviction cannot stand. In making this critical determination, we are not bound by the Arizona Supreme Court's

holding that the statements were voluntary. Instead, this Court is under a duty to make an independent evaluation of the record. *Davis v. North Carolina*, 384 U.S. 737, 741–42 [86 S.Ct. 1761, 1764, 16 L.Ed.2d 895]...."

The Supreme Court of the United States in *Miller v. Fenton*, — U.S. —, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985) specifically held that the voluntariness of a confession is not an issue of fact entitled to the § 2254(d) presumption, but is a legal question meriting independent consideration in a federal habeas corpus proceeding.

Quite aside from the finding by the state courts, therefore, I must review the record to determine whether Harper's statements of October 13, 1978, and January 8, 1979, were the product of a rational intellect and a free will. If they were, they were properly usable as possible impeachment of Harper, were he to take the stand. He did not take the stand and the claim is that he was deterred in doing so because of the trial judge's holding that the statements of October 13, 1978, and January 8, 1979, could be used as impeachment.

■ Although I have thoroughly reviewed the record as it now exists, the petitioner has asked for a hearing at which he may submit other evidence. It is proper that he have such a hearing, if he has additional evidence to present.

■ As to that portion of Claim 13A that the identity of the chemical poison used was the "fruit" of a tainted statement or statements, and therefore inadmissible at the trial, that determination may also be a matter for me to find, rather than depending upon findings by the state courts. The court in *Hamilton v. Nix*, 781 F.2d 619 (8th Cir.1985), in a two-to-one decision said, in footnote 8, page 625:

"The state also properly points out that the findings of the state court on factual questions are entitled to a presumption of correctness. *Sumner v. Mata*, 455 U.S. 591 [102 S.Ct. 1303, 71 L.Ed.2d 480] ... (1982); 28 U.S.C. § 2254(d). We are therefore bound by the state court's finding that the police were aware of Maxine Hamilton's identity and potential as a witness prior to the occurrence of any police misconduct since that finding is supported by the record. While accepting these facts as true, we are not, however, bound by the state court's holding regarding the ultimate question of the constitutionality of admitting the evidence. Whether the evidence was attenuated, had an independent source, or would inevitably have been discovered are questions of federal law.... [citations omitted]"

Accordingly, the petitioner, as well as the state, should be given the opportunity to present any additional evidence on the subject of whether the identity of the chemical poison was the fruit of the statements of the petitioner on October 13, 1978, or January 8, 1979, or, on the other hand, was attenuated, had an independent source, or would inevitably have been discovered.

### CLAIM 13B—IMPROPER PROSECUTORIAL COMMENT

■ During the closing argument to the jury, the prosecutor recounted in great detail the evidence of the defendant's guilt in entering the home of his former girlfriend and her husband and children, inserting a carcinogenic drug into a lemonade pitcher in the icebox. He then said:

"Another aspect of the thing is that whoever did this—It's—It's not a secret that these people are sick, and it's not a secret that people have died. All along, you know, the person that did it can do one thing. He can say, 'Yeah, the substance used was this, so I'm going to help....' "

(Bill of Exceptions, VII, 1331:15–19).

The defense counsel immediately moved for a mistrial and the judge denied the motion but instructed the jury to disregard the statements.

*Darden v. Wainwright*, — U.S. —, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986) set the standard for determining whether a prosecutor's remarks amount to a denial of

due process. The court said at ——, 106 S.Ct. at ——:

"The relevant question is whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process'. *Donnelly v. DeChristoforo,* 416 U.S. 637 [94 S.Ct. 1868, 40 L.Ed.2d 431] (1974). Moreover, the appropriate standard of review for such a claim on writ of habeas corpus is 'the narrow one of due process, and not the broad exercise of supervisory power.' *Id.,* at 642 [94 S.Ct. at 1871]."

The petitioner has objected to the magistrate's report and recommendation in this respect, arguing that the magistrate has confused two different lines of authority regarding improper prosecutorial comments in closing arguments. He argues that *Darden v. Wainwright* and *Brooks v. Kemp,* 762 F.2d 1383 (11th Cir.1985) deal with inflammatory, not inaccurate, prosecutorial statements, whereas the statement involved in the present case is an inaccurate one and should be governed by the due process principles of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) and *United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). I find no such confusion. *Brooks v. Kemp* dealt with some comments that were inflammatory and some that were not supported by the evidence. *Brady v. Maryland* and *United States v. Agurs* do not deal with closing argument, but with evidence that the prosecution did not disclose. In any event, the standard used in *Brady* and *Agurs* would not be helpful to the defense here. The court in *Agurs* defined the standard of undisclosed evidence as follows:

"The proper standard of materiality must reflect our overriding concern with the justice of the finding of guilt. Such a finding is permissible only if supported by evidence establishing guilt beyond a reasonable doubt. It necessarily follows that if the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed. This means that the omissions must be evaluated in the context of the entire record. If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial. On the other hand, if the verdict is already of questionable validity, additional evidence of relatively minor importance must be sufficient to create a reasonable doubt."

*Id.* 427 U.S. at 112–13, 96 S.Ct. at 2401–02.

Here the prosecutor's statement, if it was inaccurate, could not have made a difference, particularly in light of the overwhelming evidence of guilt. The prosecutor's statement was stricken instantly, was not repeated or alluded to again, and was of nominal significance.

## CLAIM 13C—INEFFECTIVE ASSISTANCE OF COUNSEL IN FAILURE TO MAKE APPROPRIATE OBJECTIONS AND INVESTIGATION PRIOR TO AND AT THE GUILT STAGE OF THE TRIAL

■ In the respondent's response to the amended petition for writ of habeas corpus, filing 14, it is alleged that this issue has not been ruled upon by a state court, due to a state court procedural default, and therefore the respondent makes the argument that the claim should not be considered because there has been no showing of cause and prejudice within the meaning of *Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977). I conclude that the issue has been fairly raised.

The motion to vacate and set aside—the pleading under Nebraska's Post-Conviction Act—alleges ineffective assistance of counsel in violation of the Sixth Amendment to the United States Constitution:

"a. By failing to adequately impeach or attack the credibility of the State's witnesses;

b. By failing to adequately investigate the case;

c. By failing to take sufficient and proper depositions of State's witnesses;

**524**

d. To render other such effective assistance of counsel in the general preparation of the case and presentation of a defense."

In *Hindman v. Wyrick*, 702 F.2d 148 (8th Cir.1983), the court ruled that raising in a post-conviction proceeding ineffectiveness of counsel but not citing the specific failure to interview or call Dr. James Griffin constituted a raising of the entire issue of ineffectiveness of counsel, including failure to interview or call Dr. Griffin as a witness. The court said:

"The assertion that Hindman's claim is not exhausted, as the respondent argues, and should therefore be dismissed, simply misapprehends the meaning of the phrase 'ground of relief' as it has been used in both habeas cases and Rule 9(b) of the Rules Governing § 2254 Cases. In *Sanders v. United States*, 373 U.S. 1, 16 [83 S.Ct. 1068, 1077, 10 L.Ed.2d 148] ... (1963), the Court said:

'(1) By "ground" we mean simply a sufficient legal basis for granting the relief sought by the applicant. For example, the contention that an involuntary confession was admitted in evidence against him is a distinct ground for federal collateral relief. But a claim of involuntary confession predicated on alleged psychological coercion does not raise a different "ground" than does one predicated on alleged physical coercion. In other words, identical grounds may also be proved by different factual allegations. So also, identical grounds may often be supported by different legal arguments....'

Mr. Hindman alleged in his Rule 27.26 proceeding that his trial counsel was constitutionally ineffective. The state courts heard evidence on this case and found against him. Now he wants to make what he says is another argument in support of this claim. It would defy common sense and the considerations of judicial economy emphasized in *Rose v. Lundy*, [455 U.S. 509, 102 S.Ct. 1198, 71 L.Ed.2d 379] *supra*, ... to hold that Hindman must return to state court, and then come back to federal district court, every time he thinks of a new piece of evidence which could have been produced."

*Id.* at 151.

I agree that all issues regarding the effective assistance of counsel throughout the criminal proceedings have been raised by the petitioner in the state court. The failures of trial counsel specified now in the amended petition for writ of habeas corpus are: failure to object to the prosecution's comment, which is the subject of Claim 13B, on the ground that the prosecutor had knowingly made a false statement to the jury; failure to request a pretrial hearing to ascertain what portion of the state's evidence was derived as a fruit of unconstitutional interrogations of Harper; failure adequately to investigate the possible defense of insanity; failure to ask Dr. Margaret Tweddle to evaluate Harper's insanity or mental capacity at the time of the crime charged; failure to present Dr. Gilligan's testimony or other evidence of the defendant's mental disorders or previous psychiatric treatment to establish an insanity or diminished capacity defense; failure to exercise independent and informed judgment regarding an insanity defense or use of psychiatric testimony; and failure to investigate a possible insanity defense promptly.

■ The ground used by the defense counsel in objecting to the statement of the prosecutor on closing arguments was sufficient to get the statement stricken and the jury instructed to disregard it. No other objection would have or should have accomplished more.

■ The failure of trial counsel to request a pretrial hearing to ascertain what portion of the state's evidence was derived from unconstitutional interrogations of Harper was not incompetence. Whether there was sufficient evidence derived that should have been excluded will be determined from the hearing on that subject yet to be held, as indicated in the discussion in

this memorandum of decision regarding Claim 13A.

■ There was no failure to investigate adequately the possible defense of insanity. I agree with the magistrate's recommendation in that regard. It is true that the trial counsel relied on the opinions of at least five mental health professionals, three of whom saw the petitioner personally and all of whom concluded that an insanity defense would not be successful in his case. Those opinions never changed before or during the trial. (Deposition of Lawrence J. Corrigan, August 4, 1982, 45:4–14.) The three who examined Harper were Dr. Margaret Tweddle, a psychiatrist and Assistant Professor at Creighton University in the Department of Psychiatry and Behavioral Science (Bill of Exceptions II, 225:9); Dr. James F. Gilligan, a psychiatrist, certified in psychiatry by the American Board of Psychiatry and Neurology, and a Director of the Institute of Law and Psychiatry of McLean Hospital in Belmont, Massachusetts, a Division of the Massachusetts General Hospital and a teaching unit of the Harvard Medical School (Bill of Exceptions, separate Volume 4 of Exhibits, Exhibit 19); and Dr. Robert Mitchell, a psychologist (Bill of Exceptions I, post-conviction hearing 1982, 73:18–20). After the trial, Dr. David Kentsmith, a psychiatrist in private practice in Omaha, Nebraska, examined Harper and testified at the post-conviction hearing that:

"I cannot say with any certainty at all that Mr. Harper was sane at the time of the crime."

\* \* \* \* \* \*

I ... have serious questions about his ... sanity. I cannot tell you ... with medical certainty ... that he was ... insane."

\* \* \* \* \* \*

This was very puzzling to me. I don't understand why he was not examined [immediately after he was arrested]."

(Bill of Exceptions I, post-conviction hearing 1982, 120:4, 127:6–8, 127:15–16.)

Dr. Kentsmith's full report is Exhibit 8 of the post-conviction hearing of 1982. The substance of the report is that he cannot be sure that Harper was sane at the time of the crime. He explained:

"In carefully reviewing the history, background development and other factors in Mr. Harpers [sic] life, however if [sic] I have been unable to identify with medical certainty a clear psychotic process or severe mental illness that would have so affected his judgment and reasoning that he would not have understood what he was doing or the consequences of his actions at the time of the crime. I however am not able to state with reasonable medical certainty that he was sane at the time of the crime given the facts."

(Comprehensive Psychiatric Evaluation, David K. Kentsmith, p. 21).

Trial counsel did investigate adequately the possible defense of insanity. Dr. Kentsmith's testimony is not sufficient to indicate a viable insanity defense under Nebraska law. Not only was trial counsel's conduct reasonable, there is no prejudice shown from any failure to pursue the matter further.

As to trial counsel's failure to ask Dr. Tweddle to evaluate Harper's insanity or mental capacity at the time of the crime, I conclude that the factual basis of the argument is lacking. Lawrence Corrigan, the defense counsel, asked Dr. Tweddle for such an evaluation and got it. It was to the effect that there was no psychiatric defense available because he was not criminally insane. (Deposition of Lawrence J. Corrigan, 8–4–82, 44:6; 47:5.)

■ The petitioner next complains that neither Dr. Gilligan's testimony nor any other evidence of the defendant's mental disorders or previous psychiatric treatment was used at the guilt phase of the trial to establish an insanity or diminished capacity defense. The reason is obvious. There simply was no testimony to use to establish an insanity or diminished capacity defense. Dr. Gilligan's report specifically declares that, "Therefore, it seems clear that he is not and has not ever been eligible for the

insanity defense with respect to the crimes with which he has been charged." (Exhibit 19, Bill of Exceptions, Separate Volume No. 4 of Exhibits, p. 6.) No other doctor was in a position to testify to anything that might conceivably establish a defense of insanity or diminished capacity. To have tried to put on such evidence for no apparent purpose would not have been to the petitioner's advantage.

 Next, the petitioner asserts that there was a failure by counsel to exercise independent and informed judgment about raising an insanity defense or putting on psychiatric testimony and a failure to investigate the mental condition of Harper promptly. I find no basis for that assertion. It is true that defense counsel testified in the post-conviction hearing that Harper did not think he was insane and the five mental health professionals who advised defense counsel, including the three who examined Harper, agreed that Harper was not and had not been insane, and it is true that defense counsel relied upon those professionals. It is not true, however, that the defense counsel did not exercise independent and informed judgment on that subject. The decision ultimately was his and he made it on an independent and informed basis. Harper was charged on January 9, 1979, and was first seen by Dr. Tweddle in March, 1979 (Bill of Exceptions, separate Volume 4 of Exhibits, Exhibit 17). Dr. Gilligan interviewed Harper three times, the first being in August, 1979. Trial was held in September and October, 1979. There was no failure to investigate promptly a possible insanity defense.

The appropriate standard is set by *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984):

> "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.

> \* \* \* \* \* \*

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires a showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

> \* \* \* \* \* \*

> Judicial scrutiny of counsel's performance must be highly deferential.

> \* \* \* \* \* \*

> Thus, a court deciding an actual ineffective claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct. A convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment. The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance. In making that determination, the court should keep in mind that counsel's function, as elaborated in prevailing professional norms, is to make the adversarial testing process work in the particular case. At the same time, the court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.

> \* \* \* \* \* \*

Accordingly, the appropriate test for prejudice finds its roots in the test for materiality of exculpatory information not disclosed to the defense by the prosecution, *United States v. Agurs,* 427 U.S. at 104, 112–113 [96 S.Ct. at 2401–02] and in the test for materiality of testimony made unavailable to the defense by Government deportation of a witness, *United States v. Valenzuela-Bernal, supra,* [458 U.S. 858] at 827 [872]–874 [102 S.Ct. 3440, 3449–50, 73 L.Ed.2d 1193]. The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

\* \* \* \* \* \*

In making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury. Some of the factual findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways. Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect. Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support. Taking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings, a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors."

*Id.* at 686, 687, 689, 690, 694, 695–96, 104 S.Ct. at 2064, 2065, 2066, 2068, 2069.

■ The petitioner's showing falters on both components. Counsel's performance has not been shown to have been deficient. Even taking the claimed deficiencies as amounting to incompetency, there is no showing that the performance prejudiced the defense.

■ No additional evidentiary hearing is necessary. The testimony of every person identified as being involved in any significant way with defense counsel's performance is before the court. I have studied it in detail and have no hint of any additional evidence that should be presented.

The extensive planning done by the defendant illustrates the fruitlessness of trying to raise an insanity defense, particularly in the absence of any positive psychiatric testimony. The trial judge, as a result of the sentencing hearing found:

"[T]he defendant apparently obtained the carcinogen involved here from his place of employment, the Eppley Institute for Cancer Research; he experimented with the substance by feeding it to pets belonging to his parents, who lived near him in East Omaha; he entered the residence at 5422 Fontenelle Boulevard at night, apparently when no one was present, to avoid detection by the intended victim(s); and he told an acquaintance, on several occasions before the crime and once afterward, what he planned to do and how his objective was to be accomplished."

(Order of sentence, November 7, 1979, p. 15)

### CLAIM 13D—FAILURE TO INTERPOSE INSANITY PLEA OVER DEFENDANT'S OBJECTION

■ This claim has never been raised before. As cause for this procedural default, he points to ineffectiveness of trial counsel and post-conviction counsel. My discussion of the weakness of any attempt to assert an insanity defense and my conclusion, as set out this memorandum under Claim 13C, illustrate that there was no ineffectiveness of counsel in failing to raise an insanity defense. No prejudice being shown, this claim is deemed waived.

### CLAIM 13E—PROSECUTORIAL MIS-CONDUCT IN THE FAILURE TO DISCLOSE RESULTS OF CHEMICAL ANALYSIS AND IN USING FALSE AND MISLEADING EVIDENCE AND ARGUMENT AT THE GUILT PHASE OF THE TRIAL

This matter has not been fairly presented to the Nebraska Supreme Court, but the state court remedies have been exhausted by virtue of the lack of a presently available state remedy. The petitioner has already pursued post-conviction relief, and the state courts would not permit a second post-conviction proceeding, because the grounds for it, if any, existed at the time of the filing of the first post-conviction motion. *State v. Ohler*, 215 Neb. 401, 338 N.W.2d 776 (1983). The failure of counsel to raise the issue, either on direct appeal or on post-conviction proceedings, did not amount to ineffectiveness. The empty brown vial was admitted into evidence but was not a "misleading link" to the nature of the drug that caused the victim's deaths.

In any event, the brief in support of an evidentiary hearing, and/or for summary judgment on certain of petitioner's claims says at p. 52:

"The allegations made in paragraph 13E of the amended petition are withdrawn. They were based on a misunderstanding of the nature of the testimony in the trial record pertaining to chemical analysis of the contents of Trial Exhibit No. 58."

### CLAIM 14A—INEFFECTIVE ASSIST-ANCE OF COUNSEL AT PENALTY PHASE

The respondent claims in its answer, filing 14, that part of this issue—that set out in subparagraph vii in the amended petition for writ of habeas corpus, filing 12, relating to failure of defense counsel to deal with a "promise" by Officer Gregory Thompson that Harper would never be executed if he confessed to Thompson—has not previously been raised. It is true that it was not specifically raised, but I conclude under the same reasoning as that given

Claim 13C that the issue, as well as all others claiming ineffectiveness of counsel, have been fairly presented to the state court. I do not accept the magistrate's recommendation in that regard.

The petitioner argues that in contending before the sentencing judge that Harper's cooperation with the police and prosecution was a mitigating factor, Harper's trial counsel should have presented the testimony of Police Officers Thompson and Miller. He asserts that the trial judge concluded that Harper had not sincerely attempted to assist the police in supplying information about the identity of the poison, needed by physicians in charge of treating the survivors. He further claims that trial counsel failed to present evidence to the trial judge demonstrating that at the time Harper told police the identity of the chemical poison he had used, the prosecution had no idea what type of poison had been used.

The findings of the sentencing judge in this respect were:

"The defendant has requested that the Court consider, as a mitigating circumstance, the fact that he admitted that he poisoned the Johnson and Shelton families and specifically identified the toxic substance, dimethylnitrosamine, which he placed into the lemonade and milk containers in the Johnsons' refrigerator, insofar as these admissions were made to assist physicians in providing treatment for the surviving family members who had ingested the toxic substance.

While these admissions are entitled to some consideration, the Court finds that any weight which may be given to them as a mitigating circumstance must be balanced aginst [sic] the failure of the defendant to take any action whatever while the lives of Duane Johnson and Chad Shelton hung in the balance during the days following September 10, 1978. This is hardly indicative of the defendant's professed regard for human life, particularly that of a small child. Certainly, the defendant, who was still in Omaha at the time, could not have been

unaware of the widespread coverage given by the print and broadcast media to what was, at the time, thought to have been an infectious epidemic resulting in illness for a number of family members. Even an anonymous telephone call, disclosing the nature of the toxic substance while concealing the identity of the caller, could have been of some assistance to the attending physicians. Instead, nothing at all was done.

It was not until after his arrest by the U.S. Marshal in Beaumont, Texas, on October 13, 1978, nearly a month after two of the victims had died, that the defendant admitted his crime; and even then he incorrectly identified the toxic substance used as being DMBA. Not until his preliminary hearing on January 4, 1979, when the State had discovered by independent investigation that the toxic substance used was dimethylnitrosamine rather than DMBA, did the defendant, who was then represented by counsel, confirm to Officer K.G. Miller of the Omaha Police Division that this was, in fact, true. Moreover, it was not until a hearing in closed chambers on July 2, 1979, that the defendant, once again with counsel present, finally admitted that he had added to the lemonade and milk containers in the Johnsons' refrigerator the quantity of six to seven (6–7) cubic centimeters of dimethylnitrosamine, undiluted with any other substance.

Therefore, the Court finds that very little weight should be given to the defendant's subsequent admissions, since he failed to act at the time when such information was essential to the survival of Duane Johnson and Chad Shelton and to the complete recovery of Bruce and Sallie Shelton and Sherrie Johnson."

(Order of Sentence, pp. 18–20)

The testimony of Officers Thompson and Miller was not presented at the penalty phase of the trial, as explained by Corrigan:

"Well, that was already in the record in its entirety from the first—from the preliminary motions. And it was quite obvious that Judge Murphy was well acquainted with the facts on those statements.... In fact, to be truthful, it never entered my mind because I knew that he'd sat through the entire hearings on both ... confessions."

(Bill of Exceptions I, post-conviction proceedings 1982, 75:22–76:2).

It is true that Judge Murphy was well acquainted with the facts in the confessions. He had heard the testimony of both Miller and Thompson regarding the confessions. The only testimony of either Thompson or Miller that was not explicitly before the sentencing judge at the time of the sentence was their opinions with respect to whether Harper was fully cooperating with them when he gave information about the identity of the drug he used in committing the crimes. At the post-conviction hearing Gregory Thompson testified:

"Q. Mr. Thompson, if you had been called later at what is an additional hearing in connection with a case that carries the death penalty, ... would you have testified that, after ... you began your discussions with Mr. Harper, he was fully cooperating with you? ...

A. I don't know. I—I would have....

Q. Did he cooperate with you? Didn't he try in the best of his ability to tell you what happened?

A. I—I would say he did.

Q. Wouldn't you have said that—under oath at a—at a later hearing prior to sentencing?

A. Yes, I probably would have."

(Bill of Exceptions I, post-conviction hearing, 1982, 27:9–22).

Kenneth G. Miller testified:

"Q. ... At a mitigation hearing, would you have testified that he did his best to cooperate with you to identify the drug that was used?

A. Yes."

*Id.* 42:23–43:1.

There is not the slightest chance that putting that testimony before the sentencing judge would have made a difference in

the sentence. The findings of the judge were not contradicted in any way by what might have been the testimony of Thompson and Miller. That testimony did not touch the finding that there was a failure of the defendant to take any action whatever while the lives of Duane Johnson and Chad Shelton hung in the balance, because the first statement by Harper to either of the officers was on October 13, 1978, nearly a month after the two victims had died. The testimony did nothing to undercut the judge's finding that even an anonymous telephone call, disclosing the nature of the toxic substance while concealing the identity of the caller, could have been of some assistance to the attending physicians and that nothing at all was done in that regard. The testimony would not have changed the judge's finding that on October 13, 1978, Harper incorrectly identified the toxic substance used as being DMBA. The testimony would not have changed the finding that by January 4, 1979, the state "had discovered by independent investigation that the toxic substance used was dimethylnitrosamine rather than DMBA." The testimony of the officers would not have touched the finding that "Moreover, it was not until a hearing in closed chambers on July 2, 1979, that the defendant, once again with counsel present, finally admitted that he had added to the lemonade and milk containers in the Johnsons' refrigerator a quantity of six to seven (6–7) cubic centimeters of dimethylnitrosamine, undiluted with any other substance."

The petitioner faults Corrigan for not presenting evidence to the trial judge demonstrating that at the time Harper told police the identity of the chemical poison he used, "the prosecution had no idea what type of poison was used." There was evidence to support the finding of the state trial judge that by January 4, 1979, when Harper identified dimethylnitrosamine as the toxic substance used, the state had already discovered that fact by independent investigation. But what contrary evidence Corrigan could have presented has not been identified by the petitioner. It may be well to withhold a final ruling on that point until completion of the evidentiary hearing on Claim 13A. If there was evidence obtainable regarding "fruit" of poisoned statements, I should know it then.

■ The remaining feature of the claim of ineffectiveness of counsel at the sentencing phase is the assertion that defense counsel failed to call to the court's attention the "promise" allegedly made by Officer Gregory Thompson to Harper in Beaumont, Texas, in October, 1978. Harper in his deposition of September 3, 1982, said that Thompson told him, before Harper confessed to the crime, that "I wouldn't ever be executed or electrocuted" and that "he told me that he had authority from the prosecution to say what he did...." (Deposition of Harper, 30:17–18, 20–22; 86:2–12). The deposition was introduced into evidence at the post-conviction hearing of September, 1982, as Exhibit 6. Gregory Thompson's testimony at the suppression hearing on July 10, 1979, was:

"I didn't promise him anything."

(Bill of Exceptions I, 147:7).

This aspect of the claim of ineffectiveness of counsel and Claim 14B of the amended petition for writ of habeas corpus are intertwined. The latter claim, which bears the heading "Broken Promise To Defendant That He Would Not Be Executed" alleges that Officer Gregory Thompson told Harper that he, Harper, was "mentally ill and that he did not belong in prison" and "belonged in a mental institution." It also alleges that Thompson told Harper that "if he confessed he would not be executed for his crime." It also alleges that Thompson told Harper that the Douglas County prosecuting attorney "had given him the authority to promise Harper that Harper would not receive the death penalty," and that Harper confessed in reliance on that representation. Evidence was produced by the deposition of Harper at the post-conviction hearing, as follows:

"And then he [Thompson] ... kept on telling me things like it would be better for me if I confessed, that I would be put in a mental institute, and that I needed

help; and like that I didn't need to go to prison, but I needed to be in a mental institute and that they were there to help me. And he also told me that I wouldn't ever be executed or electrocuted. And then I asked him by what—how could he tell me all these things if he was just a policeman. And he told me that he had authority from the prosecution to say what he did, to make any type of deal, is what I understood it."

(Deposition of Harper, 9/3/82 30:12–23).

Thompson, as earlier indicated in this memorandum, testified at the suppression hearing that he had made no promises to Harper.

No finding of the truth or falsity of Harper's and Thompson's testimony has been made by any court. A finding needs to be made for resolution of the issues of ineffectiveness of counsel and of Claim 14B. Both sides should be afforded an occasion to add whatever evidence on the subject remains unpresented.

### CLAIM 14B—BROKEN PROMISE TO DEFENDANT THAT HE WOULD NOT BE EXECUTED

The discussion at the end of the immediately preceding section of this memorandum concludes that an evidentiary hearing is needed.

### CLAIM 14C—FIFTH AND SIXTH AMENDMENT VIOLATIONS AT SENTENCING

The magistrate with respect to this claim said:

"The petitioner also enumerates claims which he argues have been fairly presented to the Nebraska Supreme Court, despite the respondent's assertion to the contrary. They are Claims ... 14C....

\* \* \* \* \* \*

Claim 14C alleges that petitioner's illegally obtained statements to police officers were improperly used against him in the sentencing determination. The petitioner points out that trial counsel object-

ed at the sentencing hearing to admission of one of the two statements. This does not demonstrate fair presentment because the challenge to the admissibility of such statements was not presented to the Nebraska Supreme Court, and further, was not presented as a federal constitutional claim. Thus, this claim cannot be considered exhausted by fair presentment.

\* \* \* \* \* \*

Claim ... 14C ... [has] not been fairly presented to the Nebraska Supreme Court. Nevertheless ... [it is] exhausted by virtue of the lack of presently available state remedy. *Picard v. Connor,* 404 U.S. 270 [92 S.Ct. 509, 30 L.Ed.2d 438] (1971). The petitioner has already pursued postconviction relief, and a subsequent attempt on the claims raised in this petition would not be allowed. *State v. Ohler,* 215 Neb. 401 [338 N.W.2d 776] (1983) (only grounds which did not exist at the time of the filing of the first post-conviction motion can be raised in a subsequent motion.)

\* \* \* \* \* \*

The claims exhausted by virtue of the lack of state court remedy are considered waived, and therefore incapable of consideration in a federal habeas action, unless the petitioner can establish sufficient cause for his procedural default as well as the existence of actual prejudice. *Wainwright v. Sykes,* 433 U.S. 72 [97 S.Ct. 2497, 53 L.Ed.2d 594] (1977).

The petitioner asserts that ... [this claim has] been exhausted by fair presentment, but notes that if the court finds otherwise, his cause and prejudice arguments relating to other claims should apply to ... [this claim] as well. Such borrowed explanations of cause are not sufficient to establish cause for the failure to raise ... [this] specific [claim]. The petitioner has not met the cause and prejudice burden with respect to ... [this claim].... [It is] waived and will not be

considered in the resolution of this habeas petition."

(Report and Recommendation at 3, 4, 5–6.)

 I conclude that the magistrate is correct in his assessment. The claim is waived. There was no incompetence on the part of Corrigan in not raising the claim previously. The petitioner wants to have his cake and eat it too. In Claim 14A the petitioner has claimed that his trial counsel, Corrigan, was ineffective in "failing to present testimony of Police Officers Thompson and Miller at the penalty phase of the trial." The petitioner thinks those officers should have been called to testify that they thought Harper was fully cooperating with them when the statements were taken about the identity of the drug used in the poisoning. But, of course, these are the very statements the sentencing judge did take into account in the sentencing and that the petitioner now in Claim 14C says the judge should not have considered. Corrigan acted within reasonable competence in freeing his client from a dilemma by not raising before the Supreme Court of Nebraska the claim that the statements should not have been considered by the sentencing judge. Post-conviction counsel similarly cannot be faulted for not raising the issue.

In his petition for a writ of certiorari to the Supreme Court of Nebraska in the Supreme Court of the United States, the petitioner through his present counsel said at 20–21:

"Here trial counsel properly decided on a strategy of emphasizing Harper's voluntary cooperation with the police in an effort to provide information helpful to the doctors. This was Harper's one plausible mitigating factor that might enable him to convince the sentencing judge to spare his life.... But although he recognized the critical importance of convincing the judge that Harper had consistently cooperated, Corrigan failed to present the testimony of police officers Miller and Thompson, both of whom subsequently confirmed that they would have attested to Harper's full and sincere efforts to provide any and all information requested...."

At the sentencing hearing the defense counsel asked the judge to consider the statement given to Officer Miller in January, 1979, and the statement made by defense counsel in the presence of Harper and the court in June or July, 1979, in mitigation. The prosecutor then asked that the court also consider the statement made by Harper in Beaumont, Texas, in October, 1978, to Officer Thompson. Defense counsel said he had some problems with the Beaumont statement and he objected to the use of that statement "for the reasons previously stated with regard to the mental and physical condition of the defendant at that time and also the testimony that was introduced there with regard to the physical situation that took place at that time." (Bill of Exceptions VII, 1427:10–15). The judge concluded that inasmuch as he had to set out his reasons for a sentence in writing and had to comment on the aggravating and mitigating circumstances, he, in fairness should consider all the statements. (Bill of Exceptions VII, 1428:1–1429:4).

The sentencing judge already had before him the statement of Corrigan put on the record in the presence of the defendant on July 2, 1979. It was a clear declaration that Harper had used or might have used

"six to seven cubic centimeters of dimethyl nitrosamine; that the substance came in the manufactured form; that there were no additional drugs in any way added, nor was the substance altered in any form; that the mixture was placed in approximately equal amounts in lemonade in a plastic container that was not full and also in a one-gallon milk container that also was not full...."

(Bill of Exceptions I, 44:11–17).

A careful review of the judge's order of sentence shows that the only conceivable purpose for which the statement in Beaumont, Texas, could have been or was used was in considering the claimed mitigating factor of revealing to the authorities the name of the drug used. It was not used to support an aggravating factor, but only to

weigh the claimed mitigating factor, the very thing defense counsel properly wanted the judge to do.

 The defendant in effect admitted to the judge on July 2, 1979, that he had used poison to commit the crime; he has admitted in his deposition that he told his counsel that he committed the crime. (Deposition of 9/3/82, 46:3–12) The evidence at the trial was overwhelming that what Harper said in his statement to Thompson about the crime was true. Even if the judge relied upon the Beaumont statement for any purpose other than as a mitigating factor, it defies the imagination to say that it made any difference. If there was error, it was harmless beyond a reasonable doubt.

The petitioner's reliance now upon *Estelle v. Smith*, 451 U.S. 454 [101 S.Ct. 1866, 68 L.Ed.2d 359] (1981), and *Wainwright v. Greenfield*, 474 U.S. 284, 106 S.Ct. 634, 88 L.Ed.2d 623 (1986), is of no help. Those cases do not reach the present situation. The petitioner's urging that failure of trial counsel to move to exclude from consideration the officer's reports of Harper's statements constitutes ineffective assistance of counsel and is therefore a cognizable on habeas corpus is flawed for the same reason. It matters not whether the officer's written reports or his oral testimony of Harper's statement be considered. Both are alike. There was a sound strategic reason for not pressing the exclusion of evidence, whether written or oral, of the Beaumont statement. There was no ineffectiveness of counsel in failing to pursue the issue to the Supreme Court of Nebraska, either on direct appeal or in the post conviction proceeding.

### CLAIMS 14D AND E—JURY INPUT IN SENTENCING

 I find the recommendation of the magistrate a proper one and adopt it. The magistrate wrote:

"The petitioner claims that he was unconstitutionally denied a jury determination on two aspects of his capital sentencing: on the finding of the existence of aggravating factors, and on the ultimate decision to impose the death sentence, including the evaluation of mitigating factors.

The Sixth Amendment does not guarantee convicted persons a right to a jury determination of the appropriate punishment to be imposed. *Spaziano v. Florida*, 468 U.S. 447 [104 S.Ct. 3154, 82 L.Ed.2d 340] (1984). Petitioner admits by brief that *Spaziano* disposes of his second claim, that regarding the determination of sentence. However, he argues, correctly, that *Spaziano* did not specifically address the jury's role with regard to factual findings on the aggravating factors, which he describes as elements of a higher degree of murder.

The identical argument for jury input on aggravating factors has been rejected by the Ninth Circuit Court of Appeals based on the facts of *Spaziano*. Although that issue was not explicitly addressed in *Spaziano*, a judge, not a jury, in that case determined the existence of aggravating and mitigating factors underlying the sentence. *Adamson v. Ricketts*, 758 F.2d 441 (9th Cir.1985). In *Roach v. Martin*, 757 F.2d 1463 (4th Cir.), *cert. denied* [—— U.S. ——] 106 S.Ct. 645 [88 L.Ed.2d 637] (1985), the court found constitutionally adequate a capital sentencing statute under which the judge found the existence of aggravating circumstances in sentencing after a plea, even though a jury performed that sentencing task upon conviction after trial.

Aggravating factors in the capital sentencing scheme are not elements of a death-deserving or "capital" crime. *Adamson v. Ricketts, supra.* By arguing that the aggravating factors are elements of a more serious, separate crime, the petitioner seeks to equate the capital sentencing proceeding with a trial on guilt or innocence and would demand the same safeguards, including trial by jury. While it is certainly true that a capital sentencing procedure is deliberately unique from other sentencings, *Lockett*

*v. Ohio*, 438 U.S. 586, 605 [98 S.Ct. 2954, 2965, 57 L.Ed.2d 973] (1978), and must, unlike other sentencing schemes, be designed with safeguards to ensure measured, consistent application and fairness to the accused, *Furman v. Georgia*, 408 U.S. 238 [92 S.Ct. 2726, 33 L.Ed.2d 346] (1972), it does not follow that such proceedings require the constitutional protections identical to those provided criminal defendants at trial. See, *Gardner v. Florida*, 430 U.S. 349 [97 S.Ct. 1197, 51 L.Ed.2d 393] (1977). There is no Sixth Amendment right to jury sentencing even where the sentence turns on specific findings of fact. See, *McMillan v. Pennsylvania*, — U.S. —, [—, 106 S.Ct. 2411, —, 91 L.Ed.2d 67] (1986). This claim is without merit and should be denied."

(Report and Recommendation at 9.)

## CLAIM 14F—LIMITATION OF MITIGATING FACTORS

 The essence of this claim is that the Nebraska Statute, § 29–2523, limits the mitigating factors that may be considered by the court to those listed in the statute itself. The argument is not well taken. The statute declares that "the court may receive any evidence of mitigating factors which it deems to have probative value." *See State v. Simants*, 197 Neb. 549, 557, 250 N.W.2d 881 (1977). Judge Murphy, in sentencing Harper, specifically said:

"The Court is also mindful of the emphasis given to this expansive interpretation by the Nebraska Supreme Court in its opinion in *State v. Simants*, 197 Neb. at 555–556, 557, 250 N.W.2d at 886, 887, and by the United States Supreme Court in the plurality opinion of Chief Justice Burger in *Lockett v. Ohio*, 438 U.S. 586 [98 S.Ct. 2954, 57 L.Ed.2d 973] ... (1978). Keeping these directives in mind, the Court, at the hearing on October 26, 1979, ordered that the defense be given until November 5, 1979, to submit any additional testimonial or documentary evidence relating to the presence of mitigating factors."

(Order of Sentence at 18.)

*Lockett v. Ohio*, 438 U.S. at 604, 98 S.Ct. at 2964–65, said:

"[W]e conclude that the Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death."

The Nebraska statute, as applied in Harper's case, did not limit the mitigating factors to be considered by the court.

Judge Murphy in passing sentencing considered evidence of Harper's cooperation with authorities in providing information about the toxic agent used and of mental impairment. He said, as to the evidence of cooperation, that it was entitled to "some consideration," but to "very little weight" (Order of sentence pp. 18, 19) and, as to mental impairment, "the capacity of the defendant to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was not impaired as a result of mental illness." (*Id.* p. 17) He also considered letters written either to the court or to the defendant's counsel, but found that the concern of the writers was not of "sufficient weight as a mitigating circumstance to absolve the defendant of responsibility for the crimes of which he has been convicted." (*Id.* p. 20)

The magistrate has pointed out correctly:

"There is no requirement that the sentencer agree with the defendant's view that the evidence offered is mitigating, only that the evidence be given consideration, regardless of the weight it is subsequently assigned. *Raulerson v. Wainwright*, [732 F.2d 803 (11th Cir.) *cert. denied* [469 U.S. 966] 105 S.Ct. 366 [83 L.Ed.2d 302] (1984)]. The weight given to any one factor or piece of evidence is wholly within the sentencer's discretion. *Barclay v. Florida*, 463 U.S. 939 [103 S.Ct. 3418, 77 L.Ed.2d 1134] (1983).

While the petitioner argues that the specified evidence is mitigating, the court, after consideration, found otherwise. There is no constitutional error."

(Report and Recommendation at 14.)

## CLAIM 14G—LACK OF DUE PROCESS AT SENTENCING

■ This claim is to the effect that the petitioner was denied the right to confront witnesses and to make appropriate objections to the admission of evidence at the sentencing hearing. Although the amended petition points to § 29–2521 of the Nebraska statute as providing no rule of procedure and § 29–2520 as permitting a capitally convicted defendant to be sentenced by "a panel of three judges," the issues, if any, arising from those statutes as such have not been developed factually or argued legally. The heart of the issue seems to be that the sentencing judge "received and considered most of the evidence on aggravation and mitigation in written form, without live testimony and without the opportunity for the defendant to cross-examine them," and that at the sentencing proceeding a "number of items of incompetent, irrelevant, and unconstitutionally obtained information ... were received and considered by the sentencing judge."

(Brief in support of an evidentiary hearing, and/or for summary judgment on certain of petitioner's claims, p. 71)

In the case of *Gardner v. Florida,* 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977), vacated a death sentence where a part of the presentence report was withheld from counsel. The plurality opinion said:

"Assurances of secrecy are conducive to the transmission of confidences which may bear no closer relation to fact than the average rumor or item of gossip, and may imply a pledge not to attempt independent verification of the information received. The risk that some of the information accepted in confidence may be erroneous, or may be misinterpreted, by

the investigator or by the sentencing judge, is manifest.

\* \* \* \* \* \*

Even if it were permissible to withhold a portion of the report from a defendant, and even from defense counsel, pursuant to an express finding of good cause for nondisclosure, it would nevertheless be necessary to make the full report a part of the record to be reviewed on appeal.... Without full disclosure of the basis for the death sentence, the Florida capital-sentencing procedure would be subject to the defects which resulted in the holding of unconstitutionality in *Furman v. Georgia.* In this particular case, the only explanation for the lack of disclosure is the failure of defense counsel to request access to the full report. That failure cannot justify the submission of a less complete record to the reviewing court than the record on which the trial judge based his decision to sentence petitioner to death.

Nor do we regard this omission by counsel as an effective waiver of the constitutional error in the record."

*Id.* at 359, 360–61, 97 S.Ct. at 1205, 1206. The magistrate recommended that this claim be denied because it has been waived. I am inclined to think I cannot consider that it has been waived in view of *Gardner v. Florida, supra,* and because the state has not claimed that it has been waived. I shall consider it on its merits.

■ The factual basis for the claim is uncertain. At the mitigation hearing on October 26, 1979, and on November 5, 1979, (Bill of Exceptions VII, 1355:16–1437:19) the evidence in written form without live testimony consisted of Exhibits 2–15, offered by the defendant without objection from the state (Bill of Exceptions VII, 1370:4) and which consist of packets of information about previous death sentences; Exhibit 16, offered by the defendant without objection from the state (*Id.* 1416:13), consisting of a pack of letters from friends, relatives, and Harper himself; Exhibits 17 and 18, offered by the defendant and received over the state's objection

(*Id.* 1435:5), consisting of a psychiatric report of Dr. Margaret Tweddle and a psychiatric report of Dr. Lynwood Heaver; Exhibit 19, offered by the defendant and received over the prosecutor's objection (*Id.* 1435:11–1436:5) and consists of a psychiatric evaluation by Dr. James F. Gilligan (Exhibits 17, 18, and 19 are found in Bill of Exceptions Separate Volume No. 4 of Exhibits.) Additionally, it is apparent that a presentence report was considered. At page 1358:3–6 of the Bill of Exceptions Volume VII the judge is shown as having said:

"I think I'm required by law to take judicial notice of the pre-sentence investigation which I have received from the Probation Office and will be glad to make available if you would like to examine it."

Mr. Corrigan then said that he would like to examine it and said that he was familiar with the contents of it and had already discussed the matter with Mr. Krell. At page 1415:22–24 of the same volume of the Bill of Exceptions Mr. Corrigan said:

"You're Honor, at this time I'd like to inform the Court that I had some time to go through the pre-sentence investigation."

It was at that point that he made the offer of Exhibit 16, the packet of letters.

I do not find that the presentence report is a part of the record before me. Although I have obtained from the office of the Clerk of the District Court of Douglas County some items—Exhibits 1, 2, 3, 4, 6, and 7 dated September 23, 1982, and Exhibit 8, dated October 12, 1982, as well as a number of unmarked documents, mostly reports of the Omaha Police Division and the deposition of Harper—I do not find a presentence report, either the one prepared prior to the sentencing on the 1975 shooting or one prepared regarding the death sentence, if one was so prepared.

The petitioner's brief in support of an evidentiary hearing and/or for summary judgment on certain of petitioner's claims declares that:

"Petitioner's rights to confront and respond were both violated by the procedures followed here. He had no opportunity to cross examine any of the persons whose statements were in the presentence report. Some of their information amounted to nothing much better than 'the average rumor or item of gossip.' *Gardner v. Florida, supra,* 430 U.S. at 359 [97 S.Ct. at 1205]. . . .

The trial court's rejection of the defendant's claims of mitigation were squarely based on his consideration of such 'evidence.' Such a critical factual determination cannot be made without the basic protections of the Sixth Amendment, and due process. No evidentiary hearing is needed of this; the record speaks for itself. Those protections were absent from the sentencing procedure in this case."

(Petitioner's brief, pp. 74–75.)

I am not able to determine whether the presentence report contains any information not much better than "the average rumor or item of gossip" without even seeing the presentence report. It appears from the record that the entire presentence report—or reports, if more than one was prepared—was presented to both counsel, but it is possible that more evidence could be developed on this subject.

All in all, it appears to me that at an evidentiary hearing counsel should be given an opportunity to present whatever additional evidence there is regarding Claim 14G.

## CLAIM 14H—BURDEN OF PROOF AT SENTENCING

The claim is that Nebraska's statute is unconstitutional because it requires capitally convicted defendants to prove that their lives should be spared by establishing that there are sufficient mitigating circumstances to approach or exceed the weight of aggravating circumstances proven. The claim is not well taken.

The Nebraska statute, § 29-2522, does not place a burden of proof upon the defendant. Evidence may be presented by

both sides, the judge or judges determine whether sufficient aggravating circumstances exist to justify imposition of a sentence of death, whether sufficient mitigating circumstances exist which approach or exceed the weight given to the aggravating circumstances, or whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases. No mention is made of any burden upon the defendant and I see no justification for reading one into the statute.

 The following from the magistrate's report and recommendation is accepted:

"Mandatory death penalty statutes are unconstitutional because they do not allow an individualized determination as to the appropriateness of the death penalty based on the character of the individual and the circumstances of the crime. *Roberts v. Louisiana,* 431 U.S. 633 [97 S.Ct. 1993, 52 L.Ed.2d 637] (1977); *Woodson v. North Carolina,* 428 U.S. 280 [96 S.Ct. 2978, 49 L.Ed.2d 944] (1976). See, *California v. Ramos,* 463 U.S. 992 [103 S.Ct. 3446, 77 L.Ed.2d 1171] (1983). The Nebraska statute, which requires a consideration of statutory aggravating and mitigating circumstances reflecting the defendant and the crime, as well as nonstatutory mitigation, certainly meets the "individualized" criteria, and cannot be considered a mandatory death penalty statute of the type found violative of the Constitution.

The petitioner suggests that, under the Nebraska statute, the defendant carries the burden of countering the aggravating factors by providing sufficiently weighty mitigating factors if he is to avoid the death penalty. This is true to the extent that if the weight of the evidence in mitigation does not approach or exceed the weight given the aggravating factors, the death penalty is warranted. The petitioner has not pointed out anything unconstitutional in this balancing process, or the defendant's role in presenting mitigating evidence. I can find no violation. See, *Ford v. Strick-*

*land,* 696 F.2d 804 (11th Cir.), *cert. denied* [464 U.S. 865] 104 S.Ct. 201 [78 L.Ed.2d 176] (1983) (weight of factors is matter for sentencer and is not susceptible to proof by either party).

The petitioner also suggests by brief that the sentencer's balancing should be guided by a standard of proof such as that adopted in Utah, requiring persuasion beyond a reasonable doubt that total aggravation outweighs total mitigation and that the imposition of the death penalty is justified and appropriate in the circumstances. The federal Constitution does not mandate such a standard of proof; rather, it is entirely a matter of state law, *Andrews v. Shulsen,* 600 F.Supp. 408 (D.Utah 1984), and therefore not a proper ground for habeas relief. *Pulley v. Harris,* [465 U.S. 37] 104 S.Ct. 871 [79 L.Ed.2d 29] (1984). See, *Zant v. Stephens,* 462 U.S. 862 [103 S.Ct. 2733, 77 L.Ed.2d 235] (1983) (specific standards for balancing circumstances are not constitutionally required)."

(Report and Recommendation at 15–16.)

## CLAIM 14I—VIOLATION OF LEGISLATIVE MANDATE IN SENTENCING

 Nebraska's statute, 29–2521.03 says:

"The Supreme Court shall, upon appeal, determine the propriety of the sentence in each case involving a criminal homicide by comparing such case with previous cases involving the same or similar circumstances. No sentence imposed shall be greater than those imposed in other cases with the same or similar circumstances."

The Supreme Court of Nebraska has interpreted that language, in order to avoid its being unconstitutional, to mean that the Supreme Court must review and analyze only cases involving a conviction for first degree murder committed on or after April 20, 1973. *State v. Williams,* 205 Neb. 56, 76, 287 N.W.2d 18, (1979); *State v. Moore,* 210 Neb. 457, 316 N.W.2d 33 (1982). Most

**538**

recently in *State v. Palmer*, 224 Neb. 282, 328, 399 N.W.2d 706 (1986), the court said:

"In some of our prior decisions we have indicated that the proportionality review in all death penalty cases is a comparison of the facts and circumstances in all first degree murder cases, whether the penalty imposed was death or life imprisonment. Upon further consideration of this question we have concluded that the review should include only those cases in which the death penalty was imposed. Since there is an automatic appellate review in all such cases, we have before us records upon which we can rely in making the analysis and comparison."

The petitioner asserts that this interpretation means that the court is permitting an imposition of a death penalty without legislative authority because it flies in the face of the plain words of the statute.

The statutory language is subject to more than one interpretation. The Supreme Court of Nebraska has struggled gamely to find that interpretation which fits the strictures of Nebraska's Constitution and is possible to perform. That the construction now adopted by the majority of the justices of that court does not meet the literal words of the statute does not mean that the construction is violative of the Fourteenth or Eighth Amendment to the Constitution of the United States. Interpreting Nebraska's statutes is the business of the Nebraska Supreme Court and when that court says that the statute means what that court says it means, my task is to read the statute as though it were written in the words used by the Supreme Court of Nebraska and then determine whether those words are within the limitations of the Constitution of the United States. No majority of the Supreme Court of the United States has ever said that a state statute must be interpreted in its most anti-death manner, even if such interpretation violates the state's constitution, and no majority of the Supreme Court of the United States has ever said that the literal words of a statute reflect the standards of decency by which the

Eighth Amendment is to be defined. The plurality opinions cited by the petitioner— *Woodson v. North Carolina*, 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976); *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976); and *Coker v. Georgia*, 433 U.S. 584, 97 S.Ct. 2861, 53 L.Ed.2d 982 (1977)—are aimed at legislative power, not at judicial powers of interpretation. The dissenting opinion of Chief Justice Burger in *Furman v. Georgia*, 408 U.S. 238, 376–77, 92 S.Ct. 2726, 2745–46, 33 L.Ed.2d 346 (1972), cited by the petitioner, is of no help to the petitioner's position, because it simply arrives at the conclusion that the inclusion of the "cruel and unusual punishments" clause in the Bill of Rights was in response to a concern over the absence of any ban on tortures. Chief Justice Burger concludes:

"There was no discussion of the interrelationship of the terms 'cruel' and 'unusual,' and there is nothing in the debate supporting the inference that the Founding Fathers would have been receptive to torturous or excessively cruel punishments even if usual in character or authorized by law."

*Id.* at 377, 92 S.Ct. at 2798.

### CLAIM 14J—VAGUE AGGRAVATING FACTORS

The Nebraska statute lists various aggravating and mitigating circumstances to be considered by the sentencer. One of those, contained in § 29–2523(1)(d), is:

"The murder was especially heinous, atrocious, cruel, or manifested exceptional depravity by ordinary standards of morality and intelligence."

The petitioner argues that this language is unconstitutionally vague. The magistrate said that it was not.

In *Holtan v. Black*, CV84–L–393 (unpublished opinion of this court, 11/5/86) [Available on WESTLAW, DCTU database], I observed that the Supreme Court of Nebraska has said that aggravating factor (d) contains two separate prongs which may operate in conjunction with or

independent of one another to establish the existence of the factor, the first prong requiring the murder to be especially heinous, atrocious or cruel—that is, a pitiless crime that is unnecessarily torturous to the victim and applies to cases where torture, sadism or extreme suffering exists. The second prong pertains to the state of mind of the actor. It applies where circumstances demonstrate exceptional depravity—that is, where it offends all standards of morality and intelligence or was senselessly bereft of any regard for human life or "so coldly calculated" as to be "senselessly bereft" of any regard for human life. That interpretation, although made clear in *State v. Moore*, 209 Neb. 88, 306 N.W.2d 183 (1982), and most recently reaffirmed in *State v. Palmer*, 224 Neb. 282, 399 N.W.2d 706 (1986), was apparent from *State v. Simants*, 197 Neb. 549, 566, 250 N.W.2d 881 (1977), *State v. Stewart*, 197 Neb. 497, 250 N.W.2d 849 (1977), *State v. Rust*, 197 Neb. 528, 538, 250 N.W.2d 867 (1977), and *State v. Holtan*, 197 Neb. 544, 250 N.W.2d 876 (1977).

The sentencing judge in the present case recognized the dichotomy, saying:

"In *State v. Rust*, 197 Neb. at 538–539, 250 N.W.2d at 874, this aggravating circumstance was construed to include murders involving torture, sadism, sexual abuse, or the imposition of extreme suffering; and in *State v. Holtan*, 197 Neb. at 548, 250 N.W.2d at 880, it was held to exist where the murder is so coldly calculated as to indicate a state of mind totally and senselessly bereft of regard for human life.

In the present case, the Court finds that aggravating circumstance (1)(d) applies in every respect. By any standard, the murders of Duane Johnson and Chad Shelton were both 'conscienceless' and 'pitiless' and were 'unnecessarily torturous to the victim.' A more horrible death than that endured by the victims in this case can hardly be imagined. Evidence established that, after ingesting the toxic substance at the Johnson residence on September 10, 1978, each of the victims deteriorated progressively over the next several days, suffering vomiting, lethargy, loss of appetite, extensive internal and external bleeding, loss of conscienceness, and eventually death. As several of the medical expert witnesses testified, the blood platelets of each of the victims were being consumed in fighting the toxic substance as it attacked in his liver and this resulted in uncontrolled bleeding at several other body sites, including the eyes, nose, and mouth. Unlike the victims in *Stewart, Rust*, and *Peery*, whose deaths were the almost instantaneous result of gunshot wounds, each of the victims in this case died a slow, agonizing death. It is brutally clear that the imposition of extreme suffering on each of them resulted from the defendant's acts.

That these murders were so coldly calculated as to indicate a state of mind totally and senselessly bereft of regard for human life is borne out by the fact that the defendant experimented with a toxic substance subsequently ingested by the victims by administering it to two pets, a dog and a cat, belonging to his parents, who lived near the defendant in East Omaha. Evidence established that the animals, like Duane Johnson and Chad Shelton, died an agonizing death. Also of considerable significance is the fact that the defendant told an acquaintance from his previous incarceration, Bill Trout, on several occasions before the crime and once afterward, what he planned to do and how his plan was to be accomplished.

\* \* \* \* \* \*

The Court finds that aggravating circumstance (1)(d) applies in its entirety and to a great degree to each of the murders in this case."

(Order of sentence at 9–10.)

I find, as I did in *Holtan v. Black, supra*, that "[t]he problem comes in the second prong of the Nebraska Supreme Court's construction. The 'torturous to the victim' language of the first prong appears to be sufficient under *Gregg v. Georgia*

[428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) ] and *Godfrey v. Georgia* ... [446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980) ], but the descriptive words of the second prong are no more specific than the words of the statute, which are ambiguous. They therefore do not meet the constitutional requirement."

██ There is a difference, however, between this case and the *Holtan* case. In *Holtan* the second prong alone was the basis for the application of the aggravating factor (d); here, both prongs were found by the sentencing judge, as well as the Supreme Court of Nebraska, to have been fulfilled by the facts. The two prongs are not separate factors; each of the prongs simply purports to be justification for application of the aggravating factor. The unconstitutional vagueness of the second prong does not diminish the virility of the first prong. Contrary to my conclusion in *Holtan*, therefore, I find no need for a resentencing of Harper on the basis of aggravating factor (d).

### CLAIM 14K—CRUELTY OF THE DEATH PENALTY IN NEBRASKA

I agree with the magistrate's assessment of this claim. He said:

"Petitioner admits that claim ... 14K ... [has] never been raised before. As cause for this procedural default the petitioner alleges the ineffective assistance of both trial and post-conviction counsel, and argues that claim ... 14K ... constitute[s] [a] novel issue.... Such assertions of cause may require a hearing unless no prejudice can be found. An examination of the merits of [this] claim is critical to the prejudice prong of the waiver determination....

\* \* \* \* \* \*

"In claim 14K the petitioner claims the death penalty is unconstitutional in Nebraska because it violates societal standards in the state. He points out as a gauge of Nebraska public opinion the fact that in 1981 the legislature passed a bill repealing the death penalty. How-

ever, because of the governor's veto, the death penalty statute remained.

The requirements of the Eighth Amendment prohibition against cruel and unusual punishment are measured against the 'evolving standards of decency that mark the process of a maturing society.' *Trop v. Dulles*, 356 U.S. 86 [78 S.Ct. 590, 2 L.Ed.2d 630] (1958). When measured against that Eighth Amendment standard, the imposition of the death penalty has repeatedly been found not to be cruel and unusual per se. *Roberts v. Louisiana*, 428 U.S. 325 [96 S.Ct. 3001, 49 L.Ed.2d 974] (1976); *Proffitt v. Florida*, 428 U.S. 242 [96 S.Ct. 2960, 49 L.Ed.2d 913] (1976); *Gregg v. Georgia*, 428 U.S. 153 [96 S.Ct. 2909, 49 L.Ed.2d 859] (1976); *McCleskey v. Zant*, 580 F.Supp. 338 (D.Ga.1984).

██ Convincing evidence of national public opinion has been relied upon in defining the societal standards governing the imposition of the death penalty under the Eighth Amendment. *Coker v. Georgia*, 433 U.S. 584, 593 [97 S.Ct. 2861, 53 L.Ed.2d 982] (1977); *Prejean v. Blackburn*, 743 F.2d 1091 (5th Cir.1984), *modified on other grounds*, 765 F.2d 482 (5th Cir.1985). However, it does not follow that the opinion of the populace of a single state can alter the Eighth Amendment standard to be applied in that jurisdiction, with the result that the death penalty would violate the Constitution of Nebraska, but not elsewhere. That argument is untenable.

██ Further, the petitioner's evidence of public opinion in Nebraska appears to be insufficient to rise to the level of a 'societal standard.' In *Prejean v. Blackburn, supra*, substantial evidence of a national and international trend toward elimination of capital punishment for youthful offenders was not sufficient to overcome the evidence of public opinion gleaned from a survey of the nation's capital punishment statutes. Thus, the mere fact of Nebraska's legislative action and veto in 1981 does not appear to prove 'a social consensus among Nebraskans that the death penalty is undesirable

and justifiably [sic] cruel,' (Petitioner's brief, 85), in light of the continued existence of Nebraska's death penalty statute and subsequent sentences imposed thereunder. See, *Thigpen v. Smith,* 603 F.Supp. 1519, 1536 and n. 11 (S.D.Ala.1985) (the 'societal values' argument appears to have lost considerable persuasive effect, at least in some situations)."

(Report and recommendation at 6, 7-8.)

Claim 14K is without merit.

## CLAIMS 14L AND 14M—ARBITRARY AND DISCRIMINATORY IMPOSITION OF DEATH PENALTY

Claim 14L is phrased in terms of application of the death penalty "arbitrarily, capriciously, and whimsically in the State of Nebraska and throughout the United States" whereas Claim 14M is phrased in terms of application against "poor males who are accused of killing caucasians, and upon the sole ground of race, poverty and sex...." The petitioner's objection to the magistrate's report and recommendation, page 23, acknowledges that "for practical purposes the two claims are the same...."

 The petitioner argues that he has had no opportunity to make a showing in support of his claim in the state court or in this court and that "Discovery and investigation and expert assistance are necessary to fully develop these facts." Indeed, no facts have been presented to the state court or to this court to support these claims. All the petitioner has done to this moment is to present in the broadest forms declarations of discrimination. No affidavits, depositions, or any other form of evidence has been presented to support these claims. The nearest the petitioner has come to even an allegation of facts is the following from his brief in support of an evidentiary hearing, and/or for summary judgment on certain of petitioner's claims, at page 87:

"Specifically, he [petitioner] has alleged that the death penalty in the State of Arizona, in the United States, and in this case has been discriminatorily imposed against impoverished males whose vic-

tims are caucasian. Petitioner believes that an inquiry will show that every current resident of Nebraska's death row, like him, is a male who killed a Caucasian and virtually every one of them, like him, was impoverished at the time of this trial. Though the question is factually complex, petitioner believes the evidence will show that this pattern shows systematic discrimination against persons like him."

I cannot imagine that such a showing would suffice to invalidate Nebraska's statute. I assume that the petitioner's brief meant to say "State of Nebraska" rather than "State of Arizona," but that is of little help. That impoverished males whose victims are Caucasian are the ones who have been sentenced to death hardly establishes discrimination without much more. The financial status of Nebraska's present death row falls far short of being enough, whatever the facts, of showing discrimination. Where there has been a total lack of any evidence presented, I conclude that there is no sufficient cause to hold an evidentiary hearing. As the court in *Harris v. Pulley,* 692 F.2d 1189, 1199 (9th Cir.1982) *rev'd on other grounds,* 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984) said with respect to a claim of intentional discrimination on the basis of the defendant's age and socio-economic status:

"Harris, however, has made no showing in support of this claim. He argues that the state has the information necessary to present this claim, but has refused to disclose it.

Harris' conclusory allegations do not provide a sufficient basis to obtain a hearing in federal court. We decline his invitation to hold that he has a right to an evidentiary hearing absent some stronger showing."

## CLAIM 14N—CRUELTY OF EXECUTION

 The petitioner admits that this claim has not previously been raised, but he asserts that effective assistance of counsel would have raised the issue. I am not

at all satisfied that effective assistance of counsel would have raised the issue. Moreover, the claim is without merit. I agree with the magistrate that nothing presented by the petitioner—there is no evidence; there is simply argument—suggests that death by electrocution amounts to cruel and unusual punishment. See the magistrate's discussion of the matter at pages 8 and 9 of his report and recommendation.

## CLAIM 14O—CRUELTY OF THE DEATH PENALTY IN FACT

 The claim consists of two ideas: one, that the conditions of the petitioner's prolonged confinement in punitive isolation on death row constitutes an infliction of pain beyond the limits of the Eighth Amendment; and two, that capital punishment is excessive because it makes no measurable contribution "to acceptable goals of punishment."

The first problem is that this claim has never been presented to the state court system of Nebraska by the petitioner. The second part of it could have been, although obviously the first part, insofar as it relates to the seven-year imprisonment of the petitioner, could not have been. It may well be that there must come a time when the state is no longer permitted to hold a person under sentence of death without carrying it out, as argued by Justice White in *Furman v. Georgia,* 408 U.S. at 311–12, 92 S.Ct. at 2763, but this case has not yet reached that point in my judgment. The merits of the second part of the argument have not been accepted by a majority of the Supreme Court of the United States and it is the one who can meaningly speak first to the subject. Thus, not only has the issue been waived in this case—there was no incompetence of counsel in failing to raise it—but on the merits it would have to be rejected.

## CLAIM 14P—UNCONSTITUTIONAL PROPORTIONALITY REVIEW

 This claim has been dealt with in part under a preceding section, Claim 14I. Additionally, the petitioner asserts that the Supreme Court of Nebraska failed to establish standards and procedures "by which to conduct" a proportionality review.

Assuming that it is because of inadequacy of counsel on post-conviction procedures that this part of the claim was not presented to the state court—an assumption which I am not willing to make—I find no merit in the contention. *State v. Williams,* 205 Neb. 56, 287 N.W.2d 18 (1979), which had been decided before Harper's direct appeal, held that L.B. 711, now codified in applicable part in § 29–2521.02, meant that:

"For all these reasons L.B. 711, Laws of 1978 . . . , will be construed to require the Supreme Court to review and analyze only cases involving a conviction for first degree murder committed on or after April 20, 1973. Where a death sentence has been imposed, and this court is required to determine the propriety of that sentence in such case, the determination of which previous first degree murder cases involve the same or similar circumstances and are therefore comparable will be made by this court on a case-by-case basis."

205 Neb. at 76, 287 N.W.2d 18.

In Harper's direct appeal he asks that the Supreme Court of Nebraska reconsider its interpretation of L.B. 711 "as to which homicide cases will be reviewed, analyzed, and compared in a case where a sentence of death has been imposed." *State v. Harper,* 208 Neb. 568, 576, 304 N.W.2d 663 (1981). In response the Supreme Court said, "we decline to do so and we reaffirm our holdings in *State v. Williams,* 205 Neb. 56, 287 N.W.2d 18 (1979)." It should not require further "standards and procedures" in order for a defendant or a movant on post-conviction proceedings to assist the Supreme Court of Nebraska in reviewing whatever cases he thought were similar to his where a sentence of death had been imposed.

The petitioner in his objection to the magistrate's report and recommendation asserts that the Supreme Court of Nebraska changed the rules in the middle of the game—"indeed, in the middle of petition-

er's very case on appeal"—but I find this not to be the case.

### CLAIM 14Q—FAILURE TO GIVE NOTICE OF AGGRAVATING FACTORS CHARGED

This claim charges that the information filed did not specify which aggravating factors the state intended to prove. The petitioner argues that his counsel was given no notice as to which aggravating factors the state intended to rely on at the penalty phase of the trial and as a result, "Petitioner's counsel was surprised and unable to fully prepare to defendant against those aggravating factors that were alleged in the sentencing proceeding in his case."

The magistrate dealt with this claim at page 19 of his report and recommendation and I agree with his assessment.

I have no reason to think that notice of aggravating factors is required in advance of the guilt phase of the trial and the petitioner has presented none. At the sentencing phase there was nothing presented by the state that was not already known by the petitioner from the guilt phase of the trial. The prosecution's evidence was testimony by Rudy J. Tesar, Clerk of the District Court of Douglas County, Nebraska, to produce and identify a certified copy of the judgment and sentence of December 6, 1976, finding Harper guilty of shooting with intent to kill, wound, or maim. The fact of that conviction had already been shown during the guilt phase of the trial and there is no hint that anything more could have been presented on the petitioner's behalf. The rest of the evidence at the penalty phase was presented on behalf of the petitioner. The aggravating factors relied upon, in addition to the one having to do with Harper's having been previously convicted of another crime involving the use or threat of violence to the person, were simply argued orally by the prosecutor and the defense counsel without any presentation of evidence, except the evidence already produced at the guilt phase of the trial. Under those circumstances, it could hardly have been a surprise to the defense counsel or the petitioner as to which of the aggravating factors specifically set out in § 29–2523 of the statute would be argued and relied upon by the prosecution.

THEREFORE IT IS ORDERED that:

1. an evidentiary hearing shall be permitted on these subjects:

 a. whether Harper's statements of October 13, 1978, and January 8, 1979, were the product of a rational intellect and a free will, and whether he was deterred from testifying at the trial because of the trial judge's holding that the statements could be used as impeachment;

 b. whether the identity of the chemical poison was the fruit of the statements of the petitioner on October 13, 1978, or January 8, 1979, or, on the other hand, was attenuated, had an independent source, or would inevitably have been discovered;

 c. whether Gregory Thompson made a promise to Steven Harper that led to the statement by Harper in Beaumont, Texas, on October 13, 1978; and

 d. whether any information relied upon by the sentencing judge was received without opportunity by the defendant to confront the one furnishing the information and whether any of the presentence report was withheld from counsel.

2. a conference will be held by the judge with counsel on March 19, 1987, at 12:15 p.m. for the purpose of scheduling an evidentiary hearing and my learning from counsel the nature of the evidence proposed to be offered.