STATE OF NEBRASKA, APPELLEE, V.
STEVEN ROY HARPER, APPELLANT.

304 N.W.2d 663

Filed April 17, 1981. No. 43070.

Thomas M. Kenney, Douglas County Public Defender, and Stanley A. Krieger for appellant.

Paul L. Douglas, Attorney General, and J. Kirk Brown for appellee.

Heard before KRIVOSHA, C.J., BOSLAUGH, McCOWN, CLINTON, BRODKEY, WHITE, and HASTINGS, JJ.

McCOWN, J.

The defendant was found guilty on two counts of first degree murder and three counts of poisoning with intent to kill, wound, or maim. After hearings on the constitutionality of the death penalty and the existence of aggravating and mitigating circumstances, a sentence of death was imposed on each of the first degree murder counts and consecutive sentences of 10 years each were imposed on the poisoning counts.

In 1973-74 the defendant, Steven R. Harper, was involved in an emotional relationship with Sandra Johnson, a woman whom he had known since high school. In late 1974 the relationship deteriorated and Sandra told the defendant she intended to marry Duane Johnson. Sandra and Duane Johnson were

married January 17, 1975. A few days later defendant attempted to persuade Sandra to annul her marriage, and when she refused defendant threatened to kill both Sandra and Duane.

On June 21, 1975, Sandra and Duane Johnson and several other members of their family were outdoors at the residence of Sandra's mother, Jean Betten. The defendant drove up to the residence and, after some argument, fired a shotgun at the group and Sandra's mother and brother were struck by shotgun pellets. As a result of the shooting incident the defendant was arrested, charged, and convicted of shooting with intent to kill, wound, or maim. He was sentenced to imprisonment in the penal complex. On November 16, 1977, defendant was paroled, and returned to Omaha.

On March 3, 1978, defendant commenced work at the Eppley Research Institute in Omaha, Nebraska. His job was to take care of the animals which the institute was using in connection with cancer research. While he was employed there the defendant had access to various carcinogenic drugs.

While working at Eppley the defendant lived in his parents' home in Omaha. On August 7, 1978, the Harper family took a dog to the veterinarian clinic and a cat on the next day. Both animals were suffering from symptoms of some type of poisoning which the veterinarian stated he had never seen before. Both animals were treated without success and both died within a few days. Shortly thereafter, on August 18, 1978, the defendant resigned his position at the Eppley Research Institute.

On Saturday, September 9, 1978, Sandra and Duane Johnson were living in a residence on Fontenelle Boulevard in Omaha, Nebraska, with their two children, a son, Michael, who was 3 months old, and a daughter, Sherry, 2 years old. Sandra's sister, Susan Conley, also lived with the family. The Johnson family and Susan left the home around 8 p.m. on

Saturday, September 9, and the family returned home at about 1 a.m. on the morning of September 10. At about 6 a.m. Susan Conley went to the refrigerator and tasted the lemonade from a pitcher but it tasted strange so she spit it out. She then had a piece of pecan pie and poured herself a glass of milk. The milk also tasted odd so she spit it out, too, and dumped the rest of the milk in the sink. Later that morning Sandra and Duane and their daughter, Sherry, got up. Sandra prepared some cereal with milk for Sherry. Duane had a glass of milk and Sandra had nothing to eat or drink.

Immediately after eating her cereal Sherry complained of a stomach ache. Sandra thought nothing of it and she and Sherry went to a shopping center. Sherry suddenly began to vomit and Sandra and Sherry returned home. Meanwhile, Harold Betten, Sandra's father, and Elaine Betten, Sandra's stepmother, had stopped at the Johnson home for a visit. The Bettens had coffee and Harold Betten saw Duane Johnson drink two glasses of some sort of liquid from the refrigerator. Neither of the Bettens had any milk or lemonade. The Bettens were leaving as Sandra and Sherry returned home. Shortly thereafter, Duane became sick and began vomiting, and by noon both Duane and Sherry were quite ill and both were in bed.

About 2 p.m. Sandra's sister, Sallie Shelton, her husband, Bruce Shelton, and their 11-month-old son, Chad, stopped at the Johnson home for a visit. They stayed approximately an hour and they split a glass of lemonade between them. Neither Sandra nor her 3-month-old son, Michael, drank milk or lemonade that day. By evening Duane Johnson, Sherry Johnson, Bruce Shelton, Sallie Shelton, and Chad Shelton were all very ill. Chad Shelton was taken to the hospital on Tuesday, September 12, and died on Thursday, September 14, 1978. His doctors thought the problem might be Reye's syndrome. Duane Johnson was taken to one doctor on September 13 and to

another doctor the next day, at which time he could not walk and was incoherent. He was taken to the hospital and died September 15, 1978.

At that point, with two persons dead and three others extremely ill, the Johnson household was investigated by medical authorities for toxic substances, without any success. Autopsies were performed on the bodies and on Monday, September 18, 1978, a meeting of some 20 doctors and public health officials was held to discuss the situation. They determined that on September 10, 1978, 10 people had been in the Johnson household and 5 of them, within 8 days, were either dead or ill while the other 5 were apparently healthy. Of the 5 people who were affected, all of them drank either milk or lemonade while at the Johnson household. Of the 5 who were not affected, none of them had consumed any milk or lemonade at the Johnsons on that day. At this point the matter was brought to the attention of the Omaha police.

The police began a homicide investigation. They discovered, among other things, the 1975 shooting incident and they received a report from the Center for Disease Control in Atlanta, Georgia, which indicated that whatever the substance was which had killed Chad Shelton and Duane Johnson, it was of a toxic nature and might well have been some type of carcinogenic drug. The report suggested checking with the Eppley Research Institute. The director, after having the situation explained to him, suggested the substance dimethylnitrosamine as the possible toxic agent. Dimethylnitrosamine is a carcinogen used to induce cancer in the liver.

With the evidence which the police had by that time, they obtained a warrant to search the defendant's home on October 3, 1978. The search revealed several empty animal cages of the type used at Eppley and two empty vials of the kind used at Eppley. Tests revealed that one vial had contained a mixture of a salt of arsenic and dimethylbenzanthracene, and the

other vial contained dimethylaminobenzaldehyde. One was a carcinogen which was stored, along with dimethylnitrosamine, in a locked refrigerator on the sixth floor of the Eppley Research Institute in an area where the defendant had worked. The key was in a receptacle next to the refrigerator.

In a long series of tests and detailed studies and by the testimony of medical forensic experts, the toxic substance which killed Chad Shelton and Duane Johnson and poisoned the other three individuals was identified as dimethylnitrosamine, a carcinogen. Dimethylnitrosamine is an extremely toxic liquid, comparatively tasteless and lethal in small quantities, which attacks the liver and disrupts the blood clotting mechanism.

Following the search of the defendant's home a warrant for his arrest was issued. On October 13, 1978, the defendant was arrested in Beaumont, Texas, and later returned to Nebraska for trial.

At the trial William Trout, a former inmate at the penal complex who became acquainted with the defendant during the defendant's imprisonment for the 1975 shooting incident, testified as a witness for the State. Trout testified that while he and the defendant were together at the penal complex the defendant told Trout that he had tried to kill his girl friend and that if he could not have her no one could.

Trout was sent to Omaha, Nebraska, on work release detail about May 1, 1978, and at that time renewed his friendship with the defendant, who had been previously paroled in November 1977. Trout saw and visited with the defendant five or six times during the summer of 1978 and also talked to the defendant on the telephone from time to time.

Trout testified that in early June 1978 in one of their conversations the defendant told Trout that in his job he had access to some very lethal drugs which would be extremely effective for use in murder. The

defendant indicated to Trout that he wanted to use the drugs to kill his former girl friend. In another conversation the defendant also told Trout that he had subjected his family cat and dog to the drugs and both had died. Trout also testified that in the last conversation that he had with the defendant while in Omaha, which occurred on Labor Day weekend 1978, the defendant said he was going to enter his girl friend's house and poison the food. The defendant told Trout that he would put the substance in something in the refrigerator which would disguise the taste of the drug.

Trout was placed on final parole September 13, 1978, and went to California on the same day. Trout testified that on October 3, 1978, he received a telephone call from the defendant from Beaumont, Texas, in which the defendant told Trout that he was about to be arrested. When Trout asked why, the defendant told him that he had gone to his former girl friend's house and put the substance in the food and that there were deaths in the family and defendant had left Omaha because he was under suspicion.

Trout did not offer any information to the police, although he knew of the crime by reading the Omaha newspaper. Trout testified under a promise that no charges would be filed against him. The defendant did not testify at the trial. One witness testified for the defense that she was with the defendant in a bar from approximately 7 p.m. September 9, 1978, until 2 a.m. September 10, 1978.

The jury found the defendant guilty on all counts. A sentence of death was imposed on each of the first degree murder counts and consecutive sentences of 10 years' imprisonment on each of the poisoning counts, and this appeal followed.

The major portions of the defendant's arguments on appeal are directed at the constitutionality of the death penalty and the constitutionality of the statutes of Nebraska dealing with its imposition. Virtually

all of the defendant's challenges have been dealt with previously by this court, including the issues of aggravating and mitigating circumstances set out in Neb. Rev. Stat. § 29-2523 (Reissue 1979). We see no point in reviewing these principles again. See, *State v. Simants*, 197 Neb. 549, 250 N.W.2d 881 (1977); *State v. Rust*, 197 Neb. 528, 250 N.W.2d 867 (1977); *State v. Stewart*, 197 Neb. 497, 250 N.W.2d 849 (1977); *State v. Otey*, 205 Neb. 90, 287 N.W.2d 36 (1979); *State v. Anderson and Hochstein*, 207 Neb. 51, 296 N.W.2d 440 (1980).

The defendant contends that the case of *Godfrey v. Georgia*, 446 U.S. 420, 100 S. Ct. 1759, 64 L. Ed. 2d 398 (1980), raises additional issues as to whether the defendant's conduct in the present case was especially heinous, atrocious, and cruel, or manifested exceptional depravity. In *Godfrey* the victims died instantly when shot and no other assault or infliction of physical pain preceded the death of either victim. The single aggravating circumstance found by the Georgia court to be present was that the killing was "outrageously or wantonly vile, horrible, and inhuman." In applying the facts of the case to the aggravating circumstances finding under rules previously set down by the Georgia court, the Supreme Court of the United States found no way to distinguish the *Godfrey* case in which the death penalty was imposed from the many cases in which it was not. We believe there is little or no relationship between *Godfrey* and the case at bar.

In the case now before us the sentencing court found four specific statutory aggravating circumstances present and no mitigating circumstances. The District Court found: (1) The defendant had previously been convicted of another crime involving the use of violence to the person; (2) The murders were especially heinous, atrocious, and cruel, and manifested exceptional depravity by ordinary standards of morality and intelligence. In that respect the court found that

the murders of Duane Johnson and Chad Shelton were both "conscienceless" and "pitiless" and were "unnecessarily torturous to the victim." After detailing the physical facts, the court found that each of the victims had died a slow and agonizing death, and that the imposition of extreme suffering on each of them resulted from the defendant's acts. The trial court also found that the murders were so coldly calculated as to indicate a state of mind totally and senselessly bereft of regard for human life; (3) At the time the murder was committed the defendant also committed another murder; and (4) The defendant knowingly created a great risk of death to at least several persons. The sentencing court found no mitigating circumstances present, and we can find no error in the sentencing court's assessment of either the aggravating or the mitigating circumstances. *Godfrey* has no application to the case at bar.

The defendant also urges us to reconsider our interpretation of 1978 Neb. Laws, L.B. 711, codified as part of Neb. Rev. Stat. Ch. 29, art. 25 (Reissue 1979), as to which homicide cases will be reviewed, analyzed, and compared in a case where a sentence of death has been imposed. We decline to do so and we reaffirm our holdings in *State v. Williams*, 205 Neb. 56, 287 N.W.2d 18 (1979).

The obligation of this court to determine the propriety of a death sentence in each case and to determine which prior first degree murder cases involve the same or similar circumstances embodies the exercise of the constitutionally imposed duty of the judiciary to determine in each case whether the conviction was lawful and whether a death sentence was legally and constitutionally imposed. Under the Constitution, so long as the death penalty is authorized by law and its imposition is left, under law, to the discretion of the judiciary, the ultimate determination of whether the death penalty was legally and constitutionally imposed in any case must remain a matter for judicial

rather than legislative determination.

The defendant next contends that the trial court erred in ruling that certain statements of the defendant, taken in violation of *Miranda* requirements and inadmissible in the State's case-in-chief, could be used for impeachment of the defendant on rebuttal if a proper foundation were laid. The defendant asserts that except for the erroneous ruling of the trial court, the defendant would have testified at trial.

The statements involved were inculpatory, one of them having been made in Beaumont, Texas, on October 13, 1978, and one made in Omaha, Nebraska, on January 8, 1979. On both occasions the police knew that the defendant was represented by counsel and that counsel had directed that there was to be no interrogation. The statements were obtained after the defendant had repeatedly refused to make a statement without the presence of his attorney. In connection with at least one statement the police promised the defendant that any statement made would never be used against him. At the hearing on the motion to suppress the District Court quite properly suppressed both statements and they were not admitted at the trial.

The U.S. Supreme Court has held that a statement of a defendant taken in violation of *Miranda* and, therefore, inadmissible in the case-in-chief may be used for impeachment purposes to attack the credibility of defendant's trial testimony if its trustworthiness meets legal standards. *Harris v. New York*, 401 U.S. 222, 91 S. Ct. 643, 28 L. Ed. 2d 1 (1971); *Oregon v. Hass*, 420 U.S. 714, 95 S. Ct. 1215, 43 L. Ed. 2d 570 (1975). We see no reason to extend the rule in Nebraska beyond the constitutional requirements laid down by the Supreme Court of the United States in *Harris* and *Hass*. In the case at bar, however, the issue is not properly before us. The trial court's ruling as to the admissibility of the statements in rebuttal was prospective only and the statements

were never offered or admitted at trial for any purpose.

The defendant also contends that the court erred in failing to grant a mistrial because of improper comments by the prosecutor in closing argument. During the final summation to the jury the prosecutor said: "Another aspect of the thing is that whoever did this — It's — It's not a secret that these people are sick, and it's not a secret that people have died. All along, you know, the person that did it can do one thing. He can say 'Yeah, substance used was this, so I'm going to help . . . .'" At this point the defense objected and moved for a mistrial. The trial court denied the motion for mistrial and immediately instructed the jury to disregard the statement. At the conclusion of the trial, as a part of the comprehensive instructions, the jury was specifically instructed that they were to draw no conclusions or inferences from the fact that the defendant had not testified in the case and that they were entitled to draw no conclusions or inferences as to his reasons in that regard.

The defendant relies upon the holding in *Griffin v. California*, 380 U.S. 609, 85 S. Ct. 1229, 14 L. Ed. 2d 106 (1965), which forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt. We do not condone comment by the prosecution on the silence of the accused, whether the comment is direct or indirect, but under the circumstances here, where the evidence of guilt was overwhelming and the trial court specifically struck the comment and instructed the jury to disregard the statement and later gave a correct and proper instruction on the failure to testify, we are constrained to find that the error, if any, was not prejudicial within the meaning of *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967).

The defendant also contends that the trial court erred in admitting evidence of the 1975 shotgun

assault. Under Neb. Rev. Stat. § 27-404 (Reissue 1979), evidence of other crimes, wrongs, or acts may be admissible for purposes such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. In the case at bar the evidence of the 1975 crime was clearly admissible under the statute. See *State v. Hitt*, 207 Neb. 746, 301 N.W.2d 96 (1981).

The final issue in the case at bar is whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. See Neb. Rev. Stat. § 29-2522 (Reissue 1979).

We have previously noted that the sentencing court found four statutory aggravating circumstances present and no mitigating circumstances. The defendant was a 25-year-old college graduate at the time these crimes were committed. His only prior criminal conviction was for the 1975 incident shown in the record here. The sentencing court meticulously considered each of the statutory aggravating and mitigating circumstances and made written findings of fact based upon the records of the trial as required by statute. Some of those findings have been previously set out. The sentencing court's finding that the murders of Duane Johnson and Chad Shelton were so coldly calculated as to indicate a state of mind totally and senselessly bereft of regard for human life appropriately summarizes the facts of this case.

Our review of first degree murder convictions finds no case which is factually comparable to the case at bar. Any objective weighing and balancing of aggravating and mitigating circumstances and comparison to the other death penalty cases now pending in this state establishes that the death sentence in the case now before us is not excessive or disproportionate to death penalties imposed in other death penalty cases under any measure of comparison.

The defendant's remaining assignments of error are without merit and the convictions and sentences are affirmed.

AFFIRMED.

KRIVOSHA, C.J., concurring in part, and in part dissenting.

I find that once again, I must in part concur with and in part dissent from the majority in its decision concerning the proper disposition of a case involving the commission of a first degree murder. See, *State v. Holtan*, 205 Neb. 314, 287 N.W.2d 671 (1980); *State v. Williams*, 205 Neb. 56, 287 N.W.2d 18 (1979); *State v. Otey*, 205 Neb. 90, 287 N.W.2d 36 (1979); *State v. Peery*, 205 Neb. 271, 287 N.W.2d 71 (1980); *State v. Rust, ante* p. 320, 303 N.W.2d 490 (1981).

I concur with the majority's finding that the judgment of conviction should be affirmed, and likewise concur with the majority's conclusion that the trial court did not err regarding the admitting into evidence of certain statements made by the appellant. I likewise concur in the majority's conclusion that the trial court did not err in refusing to declare a mistrial because of allegedly improper comments by the prosecutor in closing argument.

With regard to the matter of the admissibility of the evidence of the 1975 gunshot assault, I likewise concur with the majority that in the instant case the evidence of the 1975 gunshot assault was relevant to prove motive and, therefore, admissible under the provisions of Neb. Rev. Stat. § 27-404 (Reissue 1979). I do not, however, believe that we should leave the impression that merely because evidence may in some manner be relevant to any one of the various noted exceptions, though the prosecution does not know which one, such evidence of prior or subsequent crimes is always admissible. See dissent of Krivosha, C.J., in *State v. Ellis, ante* p. 379, 399, 303 N.W.2d 741, 753 (1981).

It is with regard to the imposition of the death penalty in this case that I must dissent. My disagreement with the majority is not because I do not believe the crime committed to be atrocious and deplorable. Quite to the contrary, I believe the crime to be flagrant and shocking. But emotions may never cancel the Constitution.

I remain firm in my view that the imposition of the death penalty is not, per se, cruel and unusual punishment in violation of the eighth amendment. *Proffitt v. Florida*, 428 U.S. 242, 96 S. Ct. 2960, 49 L. Ed. 2d 913 (1976). I likewise remain firm in my belief that the imposition of the death penalty is not immoral or unethical. See dissent in *State v. Williams, supra.*

Moreover, I am now convinced that there are indeed some instances, though extremely limited, when the imposition of the death penalty is constitutionally permissible. I believe that "killers for hire" may be executed as a consequence of their conviction. See *State v. Anderson and Hochstein*, 207 Neb. 51, 296 N.W.2d 440 (1980). There may be other limited categories which have not as yet been presented to the court for consideration. As to those, I shall reserve comment at this time.

However, I have now concluded that under the limitations imposed upon courts by both the federal and state Constitutions, the imposition of the death penalty as now applied in most other instances is arbitrary and capricious and not permitted.

As I noted in my dissent in *State v. Rust, supra,* even disregarding the provisions of 1978 Neb. Laws, L.B. 711, now Neb. Rev. Stat. §§ 29-2521.01 et seq. (Reissue 1979), the death penalty is generally in violation of one's constitutional rights prohibiting the imposition of the death penalty in an arbitrary and capricious manner.

In *State v. Rust, supra* at 327, 303 N.W.2d at 495, I observed: "A reading of the various opinions rendered in the case of *Furman v. Georgia*, 408 U.S. 238, 92

S. Ct. 2726, 33 L. Ed. 2d 346 (1972), makes it manifestly clear that the adoption of statutes such as Neb. Rev. Stat. § 29-2522 (Reissue 1979), and the provisions of L.B. 711, are simply a response to the United States Supreme Court's recognition that it is a violation of an individual's constitutional rights when the decision to execute is arrived at in an arbitrary and discriminatory manner. The fact that we may create criteria to aid us in imposing the death penalty does not overcome the constitutional prohibition if, after applying the formula, *we nevertheless continue to impose the penalty in an arbitrary and capricious manner.*" (Emphasis supplied.)

I believe that the language of the majority opinion in *Gregg v. Georgia,* 428 U.S. 153, 96 S. Ct. 2909, 49 L. Ed. 2d 859 (1976), though not reaching my present conclusion, does in fact support that conclusion. It reads in part as follows: "While *Furman* did not hold that the infliction of the death penalty *per se* violates the Constitution's ban on cruel and unusual punishments, it did recognize that the penalty of death is different in kind from any other punishment imposed under our system of criminal justice. Because of the uniqueness of the death penalty, *Furman* held that it could not be imposed under sentencing procedures that created a substantial risk that it would be inflicted in an arbitrary and capricious manner. . . . '[T]he Eighth and Fourteenth Amendments cannot tolerate the infliction of a sentence of death under legal systems that permit this unique penalty to be so wantonly and so freakishly imposed.' [Citation omitted.]

"*Furman* mandates that where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." *Id.* at 188-89.

As I have noted, examining a host of cases decided

within this jurisdiction makes it clear to me that the imposition of the death penalty in most cases in this state is indeed arbitrary and capricious. See analysis of cases in dissent, *State v. Williams, supra,* and *State v. Rust, supra.*

Not only does an analysis of those cases referred to in *Williams* and *Rust* lead one to the inescapable conclusion that the imposition of the death penalty is arbitrary and capricious, but a further examination of those cases in which a charge of second degree murder is filed, rather than first degree murder, likewise makes it clear that by the time a case comes to this court for examination there have been a sufficient number of arbitrary decisions made so as to make impossible the imposition of the death penalty in anything other than an arbitrary and capricious manner. While I do not for a moment question the right of the prosecutor to elect the charge to be filed, nor do I for a moment urge any change in that process, I likewise cannot ignore its existence in attempting to rationally analyze whether the death penalty can be imposed in anything other than an arbitrary manner except in very rare instances. I am not unmindful of the fact that this argument has already been rejected by the majority in the *Gregg* case. Nevertheless, I believe that in this respect the majority in *Gregg* is totally in error.

One need only examine two of the cases released by this court this day to note how the matter of prosecutorial discretion of necessity results in the death penalty being arbitrarily imposed. In addition to this case where the penalty of death was imposed, we have this day also announced our decision in the case of *State v. Stranghoener, post* p. 598, 304 N.W.2d 679 (1981). In that case we have affirmed a sentence of 20 years given to Stranghoener for second degree murder. The facts of the case, however, indicate to me that the appellant was, indeed, guilty of first degree murder. The facts in the *Stranghoener* case

disclose that Stranghoener, together with several other individuals, carefully, cruelly, and viciously planned the execution of one Jim Goslee, a member of their "family," for no other reason except to test the loyalty of another member of the "family." Stranghoener, though originally charged with first degree murder, was permitted as a part of a plea bargain to plead to the lesser charge of second degree murder and was sentenced to prison for 20 years. While one does not question or quarrel with the right of either the prosecution or the trial court in *Stranghoener*, it is impossible to set this case alongside those cases in which the death penalty has been imposed and discern a rational distinction.

Moreover, the *Stranghoener* case is not an isolated instance. An examination of only a few cases decided since 1973 establishes clear examples of how the imposition of the death penalty in a particular case is mere happenstance. In the case of *State v. Wredt*, *ante* p. 184, 302 N.W.2d 701 (1981), the defendant was permitted to plead guilty to second degree murder of his father. The evidence discloses that the defendant was 16 years old at the time of the commission of the crime. On the evening of the murder the defendant took a .45-caliber revolver outside and waited for his father to come home, which he did shortly after 6 p.m. After the father got out of his truck and started walking toward the house, the defendant stepped out from the corner of the house, aimed and cocked the revolver, and fired one shot into his father's chest which killed him instantly.

In *State v. Rouse*, 206 Neb. 371, 293 N.W.2d 83 (1980), the defendant was permitted to plead guilty to second degree murder as a result of a plea bargain arrangement and was sentenced to a term of 16 to 20 years in the penal complex. Defendant had originally been charged with six felony counts, including one count of first degree murder, one count of felony murder, three counts of burglary, and one count of

escape. The killing was of a police officer apparently seeking to apprehend defendant in connection with the burglary.

In *State v. Thompson*, 199 Neb. 67, 255 N.W.2d 880 (1977), the defendant was permitted to plead guilty to a charge of second degree murder after the State amended the complaint originally charging the defendant with first degree murder. He was sentenced to life imprisonment. The defendant had attended a party at the home of his sister. During the evening an argument developed, a fight broke out, and several guests subdued the defendant by getting him down on the floor. The defendant worked until noon the following day, purchased a .22-caliber semiautomatic rifle and some ammunition, and then returned to his apartment. At about 8 p.m. his niece and sister came to see him. The defendant told them he was going to kill someone, whom he described. Later that evening the defendant walked into his sister's house, carrying the loaded rifle. There were a number of people in the house, including the victim. The defendant pointed the gun at a Mrs. Hicks and said he wanted to talk to her about what had happened the night before. He also pointed the rifle at several other persons in the room. A brief fight ensued, and after it was broken up the victim started to leave the room when the defendant shot him, striking him in the chest near his right shoulder, severing his trachea and several arteries. The victim died almost instantaneously.

In *State v. Laravie*, 192 Neb. 625, 223 N.W.2d 435 (1974), the defendant was charged with first degree murder and pled guilty to a reduced charge of second degree murder. He was sentenced to life imprisonment. The evidence discloses that the defendant broke into a residence in the early morning, picked up a knife from the kitchen table, then entered the bedroom of a 2-year-old child. When the 2-year-old cried out, the defendant stabbed him twice in the chest, causing his death.

In the case of *State v. Reyes*, 192 Neb. 153, 219 N.W.2d 238 (1974), the defendant was permitted to plead guilty to second degree murder pursuant to a plea bargain. He was sentenced to 20 years' imprisonment for the killing. The evidence discloses that the defendant approached the victim on a street corner where he had been standing with a 6-pack in each hand. The defendant shot the victim five times, killing him instantly.

The cases cited above are simply those which were appealed to this court and therefore found in the Nebraska Reports. We have no quick way of determining how many more cases of this nature can be found by examining the various District Court records. To be sure, the appealed and reported cases are not the only instances where this disparity occurs.

While I have already acknowledged that such variances and discretion are not within the control of the courts, and should not be within the control of the courts, I, nevertheless, cannot ignore the reality of those matters in attempting to determine whether the death penalty is imposed in a nonarbitrary and noncapricious manner in this state.

The words of Mr. Justice Stewart in *Furman v. Georgia*, 408 U.S. 238, 92 S. Ct. 2726, 33 L. Ed. 2d 346 (1972), seem most applicable to this analysis. At 309-10, he said: "These death sentences are cruel and unusual in the same way that being struck by lightning is cruel and unusual. For, of all the people convicted of rapes and murders in 1967 and 1968, many just as reprehensible as these, the petitioners are among a capriciously selected random handful upon whom the sentence of death has in fact been imposed. . . . I simply conclude that the Eighth and Fourteenth Amendments cannot tolerate the infliction of a sentence of death under legal systems that permit this unique penalty to be so wantonly and freakishly imposed." I likewise must conclude that the Constitution of the United States and the Constitution of the State of

Nebraska cannot tolerate the infliction of a sentence of death to be so wantonly and so freakishly imposed. Recognizing the system to be what it is, and further recognizing that the system must at least for the present remain as it is, I find no other alternative but to conclude that the Constitution of the United States and the Constitution of the State of Nebraska preclude the imposition of the death penalty except in but a few extremely isolated cases.

However, I wish not to be misunderstood by what I have said here. I do not believe that persons convicted of murder should be quickly forgiven and returned to society. Quite to the contrary, I believe that having acted like an animal in the commission of the crime, they should now be restrained as an animal during the balance of their lives. If it is indeed punishment we seek to impose, and I find no fault with that, then requiring them to live out the balance of their lives in a 9- x 6-foot cell, isolated from civilization and any of the benefits of freedom, would indeed be an appropriate punishment.

For me, the question is not whether the convicted should be punished but, rather, whether the form of punishment is permitted under the Constitution. Having now attempted for more than 2 years to glean any reasonable pattern in which one is either selected to be charged with first degree murder or selected to be executed, and being unable to do so, I must conclude our selection process is arbitrary and capricious and therefore invalid. The fact that we act arbitrarily in accordance with standards which we have established to aid us in making our decision, but which in fact repeatedly fail, does not cure the constitutional defects in the scheme.

Concluding, as we have, that all persons who have been ordered executed are treated alike does not address the issue. Discrimination is determined by examining the entire class and not just those who are discriminated against. The class is persons who

have unlawfully killed and not persons sentenced to death. That is what §§ 29-2521.01 et seq. seek to address.

I would sentence the appellant herein to be incarcerated in the penal complex for the balance of his natural life, and I would hope that the Board of Pardons would not commute the sentence so as to make him eligible to be released.