**Steven Roy HARPER, Appellant,**

v.

**Gary GRAMMER, Warden, Appellee.**

No. 87–2708.

United States Court of Appeals, Eighth Circuit.

Submitted Oct. 19, 1988.

Decided Feb. 5, 1990.

Vincent M. Powers, Lincoln, Neb., for appellant.

Robert M. Spire, Lincoln, Neb., for appellee.

Before McMILLIAN and WOLLMAN, Circuit Judges, and FLOYD R. GIBSON, Senior Circuit Judge.

WOLLMAN, Circuit Judge.

Steven Roy Harper appeals the district court's [1] denial of his petition for a writ of habeas corpus. We affirm.

Harper was convicted of two counts of first degree murder for the poisoning of Duane Johnson and Chad Shelton. He was also convicted of three counts of poisoning with intent to kill, wound, or maim three other persons. The trial court sentenced Harper to death for each first degree mur-

---

**1.** The Honorable Warren K. Urbom, United States District Judge for the District of Nebraska.

der count and to consecutive ten-year terms for each poisoning count. After the Nebraska Supreme Court affirmed Harper's conviction and sentences of death, *State v. Harper*, 208 Neb. 568, 304 N.W.2d 663, *cert. denied*, 454 U.S. 882, 102 S.Ct. 368, 70 L.Ed.2d 194 (1981), Harper petitioned the trial court for post-conviction relief. The trial court denied such relief, and the Nebraska Supreme Court affirmed, *State v. Harper*, 214 Neb. 911, 336 N.W.2d 597 (1983), *cert. denied*, 465 U.S. 1013, 104 S.Ct. 1016, 79 L.Ed.2d 246 (1984).

Harper then petitioned the United States District Court for the District of Nebraska for a writ of habeas corpus. The district court denied the writ, and this appeal followed.

## I.

The facts giving rise to Harper's conviction are fully set forth in the Nebraska Supreme Court's opinion in Harper's direct appeal, *State v. Harper*, 304 N.W.2d at 665-67, and we will only summarize them here.

In 1973-74 Harper was involved in an emotional relationship with Sandra Johnson, whom he had known since high school days. This relationship deteriorated in late 1974. Sandra Johnson married Duane Johnson in January of 1975. Shortly thereafter, Harper attempted to persuade Sandra to annul the marriage. When she refused, Harper threatened to kill both her and her husband.

On June 21, 1975, Sandra and Duane Johnson, together with several other members of their family, were standing outside the residence of Sandra's mother. Harper drove up to the residence and, after some argument, fired a shotgun at the group. Sandra's mother and brother were struck by the pellets. Harper was convicted of shooting with intent to kill, wound, or maim. He was sentenced to imprisonment and was released on parole on November 16, 1977, whereupon he returned to his parents' home in Omaha, Nebraska.

In early March of 1978, Harper started working at the Eppley Research Institute in Omaha. It was his responsibility to take care of the animals that the Institute was using in connection with cancer research. Harper had access to various carcinogenic drugs during the course of his employment.

In early August of 1978, a dog and a cat belonging to Harper's family were found to be suffering from a type of poisoning that the attending veterinarian had never before seen. Treatment was unsuccessful, and both animals died within a few days. On August 18, 1978, Harper resigned from his position at the Eppley Research Institute.

In September of 1978, Sandra and Duane Johnson were living in Omaha with their three-month-old son, Michael, and their two-year-old daughter, Sherry, together with Sandra's sister, Susan Conley.

The Johnsons and Susan Conley were gone from the Johnson residence from 8:00 p.m., September 9, 1978, until 1:00 a.m. on September 10, 1978. At about 6:00 a.m., Susan Conley attempted to drink some lemonade and milk from containers in the refrigerator but spit both liquids out after she detected a strange taste. Later that morning Sherry and Duane Johnson both drank some milk from the container as part of their breakfast meal. Sherry Johnson became ill shortly thereafter. Still later that morning Duane Johnson drank two glasses of liquid from a container in the refrigerator. Shortly thereafter he became ill, and by noon both he and Sherry had become so ill that they were bedridden. That afternoon Sandra's sister and brother-in-law, Sallie and Bruce Shelton, together with their eleven-month-old son, Chad, stopped at the Johnson home. While they were there, they shared a glass of lemonade among themselves. By the evening of September 10, Duane and Sherry Johnson and the three Sheltons were all very ill. Chad Shelton was hospitalized on September 12, and died on September 14, 1978. Duane Johnson was also hospitalized, and died on September 15, 1978.

After an intensive investigation, it was determined that the substance that had killed Duane Johnson and Chad Shelton and poisoned Sherry Johnson, Sallie Shel-

ton, and Bruce Shelton, was dimethylnitrosamine, a carcinogen that attacks the liver and disrupts the blood clotting mechanism. Dimethylnitrosamine is an extremely toxic liquid, comparatively tasteless and lethal in small quantities.

A search of the Harper home produced two empty vials of the kind used at the Eppley Research Institute. One had contained a mixture of salt and arsenic and dimethylbenzanthracene, and the other dimethylaminobenzaldehyde. One of these substances was a carcinogen that was stored together with dimethylnitrosamine in a refrigerator at the Eppley Research Institute in an area where Harper had worked.

At Harper's trial, William Trout, a former inmate at the Nebraska Penal Complex who had become acquainted with Harper during Harper's imprisonment for the 1975 shooting incident, testified that while he and Harper were serving time together Harper had told him that he had tried to kill his girlfriend and that if he could not have her no one else could.

Trout was sent to Omaha on work release detail in the spring of 1978 and renewed his friendship with Harper. Trout visited with Harper in person five or six times during the summer of 1978 and also talked to him on the telephone from time to time. He testified that in early June 1978 Harper told him that at work he, Harper, had access to some very lethal drugs that would be extremely effective for use in murder. Harper indicated to Trout that he wanted to use the drugs to kill his former girlfriend. Harper also told Trout that he had subjected his family cat and dog to the drugs and that both animals had died. Trout testified that in a conversation that occurred during the 1978 Labor Day weekend, Harper had said that he was going to enter his girlfriend's house and poison the food. Harper stated that he would put the substance into something in the refrigerator that would disguise the taste of the drug.

Following Harper's conviction on the two counts of first-degree murder, the trial court proceeded, in accordance with Neb.

Rev.Stat. § 29–2520, to determine whether Harper should be sentenced to death. In accordance with Neb.Rev.Stat. § 29–2522, the trial court entered extensive findings concerning the existence or nonexistence of the aggravating and mitigating circumstances set forth in Neb.Rev.Stat. § 29–2523. The trial court found that of the eight aggravating circumstances defined in Neb.Rev.Stat. § 29–2523, three were established by the evidence and were thus applicable to Harper's case:

> The offender was previously convicted of another murder or a crime involving the use or threat of violence to the person, or has a substantial history of serious assaultive or terrorizing criminal activity. § 29–2523(1)(a).

> The murder was especially heinous, atrocious, cruel, or manifested exceptional depravity by ordinary standards of morality and intelligence. § 29–2523(1)(d).

> At the time the murder was committed, the offender also committed another murder. § 29–2523(1)(e).

> The offender knowingly created a great risk of death to at least several persons. § 29–2523(1)(f).

In finding that section 29–2523(1)(d) was applicable in every respect, the trial court wrote:

> By any standard, the murders of Duane Johnson and Chad Shelton were both "conscienceless" and "pitiless" and were "unnecessarily torturous to the victim." A more horrible death than that endured by the victims in this case can hardly be imagined. Evidence established that, after ingesting the toxic substance at the Johnson residence on September 10, 1978, each of the victims deteriorated progressively over the next several days, suffering vomiting, lethargy, loss of appetite, extensive internal and external bleeding, loss of consciousness, and eventually death. As several of the medical expert witnesses testified, the blood platelets of each of the victims were being consumed in fighting the toxic substance as it attacked his liver, and this resulted in uncontrolled bleeding at sev-

eral other body sites, including the eyes, nose, and mouth. Unlike the victims in [*State v.*] *Stewart*, [197 Neb. 497, 250 N.W.2d 849 (1977)], [*State v.*] *Rust*, [197 Neb. 528, 250 N.W.2d 867 (1977)], and [*State v.*] *Peery*, [199 Neb. 656, 261 N.W.2d 95 (1977)], whose deaths were the almost instantaneous result of gunshot wounds, each of the victims in this case died a slow, agonizing death. It is brutally clear that the imposition of extreme suffering on each of them resulted from the defendant's acts.

That these murders were so coldly calculated as to indicate a state of mind totally and senselessly bereft of regard for human life is borne out by the fact that the defendant experimented with the toxic substance subsequently ingested by the victims by administering it to two pets, a dog and a cat, belonging to his parents, who lived near the defendant in East Omaha. Evidence established that the animals, like Duane Johnson and Chad Shelton, died an agonizing death. Also of considerable significance is the fact that the defendant told an acquaintance from his previous incarceration, Bill Trout, on several occasions before the crime and once afterward, what he planned to do and how his plan was to be accomplished.

Order of Sentence at 9–10.

The trial court then entered the following specific findings:

(1) That the murders of Duane Johnson and Chad Shelton were especially heinous, atrocious, and cruel;

(2) That the murders of Duane Johnson and Chad Shelton manifested exceptional depravity by ordinary standards of morality and intelligence;

(3) That the murders of Duane Johnson and Chad Shelton were conscienceless and pitiless crimes which were unnecessarily torturous to the victims;

(4) That the murders of Duane Johnson and Chad Shelton involved the imposition of extreme suffering; and

(5) That the murders of Duane Johnson and Chad Shelton were so coldly calculated as to indicate a state of mind totally and senselessly bereft of regard for human life.

Order of Sentence at 10.

The trial court then found that none of the statutory mitigating circumstances set forth in Neb.Rev.Stat. § 29–2523 existed and that the additional mitigating factors that Harper had presented were not of sufficient weight to approach or exceed the weight given to the aggravating circumstances. The trial court accordingly imposed a sentence of death on each of the two murder counts on which Harper had been convicted.

## II.

Harper's petition for a writ of habeas corpus in the United States District Court raised numerous challenges to his conviction and sentence. The district court referred the petition to a United States magistrate[2] for review and recommendation. Upon receiving the magistrate's recommendations on the issues presented by the petition, the district court reviewed the entire record and, on February 24, 1987, filed a thorough, extensive memorandum opinion treating each of the issues in detail. *See Harper v. Grammer*, 654 F.Supp. 515 (D.Neb.1987). As a part of the decision, the district court ordered that an evidentiary hearing be held on four issues raised by the petition. The evidentiary hearing was held on November 5, 1987, and on December 15, 1987, the district court entered a supplementary memorandum opinion that ruled adversely to Harper on the issues considered at the evidentiary hearing and denied the petition for writ of habeas corpus.

On appeal, Harper asserts some ten issues, only several of which we will treat in any detail.

## III.

As we view the case, the most substantial question raised in this appeal is Harper's challenge to the constitutionality of

**2.** The Honorable David L. Piester, United States Magistrate for the District of Nebraska.

his death sentence. He contends that the language in Neb.Rev.Stat. § 29–2523(1)(d) is unconstitutionally vague.

■ If a state wishes to authorize capital punishment, it must tailor and apply its law in a manner that avoids the arbitrary and capricious infliction of the death penalty. *See Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972). "It must channel the sentencer's discretion by 'clear and objective standards' that provide 'specific and detailed guidance,' and that 'make rationally reviewable the process for imposing a sentence of death.'" *Godfrey v. Georgia,* 446 U.S. 420, 428, 100 S.Ct. 1759, 1764–65, 64 L.Ed.2d 398 (1979) (citations omitted). In *Godfrey,* the United States Supreme Court struck down a Georgia statute that authorized the death penalty when the murder was "outrageously or wantonly vile, horrible or inhuman * * * in that it involved * * * depravity of mind." *See Newlon v. Armontrout,* 885 F.2d 1328, 1333–35 (8th Cir.1989); and *Smith v. Armontrout,* 888 F.2d 530, 538–39 (8th Cir. 1988), for our court's recent discussion of the principles of constitutional narrowing announced in the foregoing decisions.

In reviewing the sentencing court's determination in Harper's direct appeal, the Nebraska Supreme Court summarized the trial court's findings, stated that the United States Supreme Court's opinion in *Godfrey v. Georgia,* 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980), had no application, and held that it found no error in the lower court's assessment of the aggravating circumstances. *State v. Harper,* 304 N.W.2d at 667–68.

The Nebraska Supreme Court has interpreted section 29–2523(1)(d) as having two components, which the word "or" divides. *See State v. Moore,* 210 Neb. 457, 316 N.W.2d 33 (1982). In decisions that predated Harper's trial, the Nebraska Supreme Court defined the language of section 29–2523(1)(d). It defined "especially heinous, atrocious, cruel," as "directed to the conscienceless or pitiless crime which is unnecessarily torturous to the victim." *State v. Simants,* 197 Neb. 549, 250 N.W.2d 881, 891, *cert. denied,* 434 U.S. 878, 98 S.Ct.

231, 54 L.Ed.2d 158 (1977). Likewise, the court held that the use of the word "especially" limited in a significant way the applicability of the aggravating circumstance. "Suffice it to say, that although all murders may be characterized as 'heinous', by the use of the word 'especially' in the subsection under consideration, our Legislature intended something more than the fact that there had been a murder." *State v. Stewart,* 197 Neb. 497, 250 N.W.2d 849, 864 (1977). The court went on to construe the second component of section 29–2523(1)(d)—"manifested exceptional depravity by ordinary standards of morality and intelligence"—to encompass acts that are "totally and senselessly bereft of any regard for human life." *Stewart,* 250 N.W.2d at 864. In *State v. Rust,* 197 Neb. 528, 250 N.W.2d 867, 874, *cert. denied,* 434 U.S. 912, 98 S.Ct. 313, 54 L.Ed.2d 198 (1977), the court indicated that murders involving torture, sadism, sexual abuse, or the imposition of extreme suffering would satisfy the requirements of section 29–2523(1)(d), citing the United States Supreme Court's opinion in *Proffitt v. Florida,* 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976).

■ As it had done in *Holtan v. Black,* CV84–L–393 (D.Neb. Nov. 5, 1986) [Available on WESTLAW, 1986 WL 12479], *vacated on other grounds, Holtan v. Black,* 838 F.2d 984 (8th Cir.1988), the district court held that the second portion of section 29–2523(1)(d) is unconstitutionally vague. The district court also held, however, that the first portion of (1)(d), as narrowed by the Nebraska Supreme Court's decisions that define the words "especially heinous, atrocious, cruel" as involving murders that are unnecessarily torturous to the victim satisfies the constitutional requirements imposed by *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), and *Godfrey v. Georgia,* 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980).

The district court then went on to hold that the constitutional invalidity of the second portion of (1)(d) did not require that Harper's death sentence be set aside:

There is a difference, however, between this case and the *Holtan* case. In *Holtan* the second prong alone was the basis for the application of the aggravating factor(d); here, both prongs were found by the sentencing judge, as well as the Supreme Court of Nebraska, to have been fulfilled by the facts. The two prongs are not separate factors; each of the prongs simply purports to be justification for application of the aggravating factor. The unconstitutional vagueness of the second prong does not diminish the virility of the first prong. Contrary to my conclusion in *Holtan*, therefore, I find no need for a resentencing of Harper on the basis of aggravating factor (d).

*Harper v. Grammer*, 654 F.Supp. at 540.

We agree with the district court that the Nebraska Supreme Court's limiting definition of the words of the first portion of section (1)(d) renders that portion of the statute constitutional under *Gregg v. Georgia, Godfrey v. Georgia*, and *Maynard v. Cartwright*, 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988). *See Newlon v. Armontrout, supra; Smith v. Armontrout, supra*. Additionally, we note that in *Maynard v. Cartwright*, the Court expressly stated that it was not holding that "some kind of torture or serious physical abuse is the only limiting construction of the heinous, atrocious, or cruel aggravating circumstances that would be constitutionally acceptable." *Id.* 108 S.Ct. at 1859–60.

Assuming, without deciding, that at the time of Harper's trial the Nebraska Supreme Court had not narrowed the language of the second portion of section 29–2523(1)(d) to bring it within constitutionally acceptable contours,[3] we agree with the trial court that the invalidity of the second portion of (1)(d) does not vitiate the efficacy of the first portion. Accordingly, we need not determine whether Harper's death sentence would have to be set aside and the

case remanded to the Nebraska state court for a redetermination of the death sentence based upon the existence of only three aggravating circumstances rather than the four that the sentencing court found to exist. We agree that the Nebraska death penalty scheme is similar to that in Oklahoma in that it requires the aggravating circumstances to be weighed against the mitigating circumstances. *See Cartwright v. Maynard*, 822 F.2d 1477, 1480 (10th Cir. 1987), *aff'd Maynard v. Cartwright*, 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988). *See also Collins v. Lockhart*, 754 F.2d 258, 265–68 (8th Cir.1985). Thus, the Supreme Court's holding in *Zant v. Stephens*, 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983), that appellate invalidation of one of several aggravating circumstances does not require reversal of a death sentence if other, valid aggravating factors are sufficient to warrant the sentence, is not applicable in this case, for the Georgia death penalty statute at issue in *Zant* utilized the presence of aggravating factors to narrow the class of death-eligible defendants, whereas Neb.Rev.Stat. § 28–303 makes all defendants found guilty of first-degree murder eligible for the death penalty.

Likewise, because we hold that section 29–2523(1)(d) is constitutional at least in part, we need not face the question whether the existence of the other, constitutionally valid, aggravating circumstances could be relied upon as independently supporting the sentence of death. In *Maynard v. Cartwright*, the Court affirmed the setting aside of the death sentence on the ground that at the time it decided Cartwright's case the Oklahoma Court of Criminal Appeals would not attempt to save the death penalty when one of several aggravating circumstances was found invalid or unsupported by the evidence. 108 S.Ct. at 1860. Likewise, in *Collins v. Lockhart*, we held that the death sentence could not stand

3. We note that the Nebraska Supreme Court has further restricted the application of section 29–2523(1)(d). *See State v. Ryan*, 233 Neb. 74, 444 N.W.2d 610 (1989); *State v. Palmer*, 224 Neb. 282, 399 N.W.2d 706 (1986), *cert. denied*, 484 U.S. 872, 108 S.Ct. 206, 98 L.Ed.2d 157 (1987);

*State v. Joubert*, 224 Neb. 411, 399 N.W.2d 237 (1986), *cert. denied*, 484 U.S. 905, 108 S.Ct. 247, 98 L.Ed.2d 205 (1987). We render no opinion regarding the effect of these decisions on the statute's meaning.

because the Arkansas Supreme Court had held that it would not engage in any sort of harmless-error analysis but would set aside a death sentence if one of several aggravating circumstances was found on appeal to be invalid. 754 F.2d at 267–68. In *Mercer v. Armontrout,* 864 F.2d 1429 (8th Cir.1988), however, we indicated that under Missouri law a death sentence need not be vacated if only one of several aggravating circumstances is later found to be deficient. *Id.* at 1435 n. 5.

In *State v. Ryan,* the Nebraska Supreme Court stated:

> The balancing of aggravating and mitigating circumstances is not merely a matter of number counting but, rather, requires a careful weighing and examination of the various factors. *State v. Joubert,* 224 Neb. 411, 399 N.W.2d 237 (1986). Additionally, this court's automatic review of capital cases does not require it to set aside a death penalty where certain aggravating factors found to exist below are determined here to be unsupported by the evidence. See Neb. Rev.Stat. § 29–2528 (Reissue 1985). A finding of a single aggravating circumstance on appeal *may* be sufficient to support a death sentence.

444 N.W.2d at 653 (emphasis supplied). Whether this statement means that the Nebraska Supreme Court will reweigh the aggravating and mitigating circumstances when an aggravating circumstance is found wanting on appeal, or whether the court will engage in a harmless error analysis, remains to be seen.[4]

In summary, then, because we agree with the trial court that the Nebraska Supreme Court had, at the time of Harper's trial, defined the first portion of section 29–2523(1)(d) in a manner that satisfies the requirements of the United States Constitution, the aggravating circumstance set forth in that portion of the statute was validly established. Accordingly, we reject Harper's challenge to his sentence of death.

## IV.

Harper presents numerous other claims, which we will address only briefly.

### A

Harper first contends that after he was arrested on October 13, 1978, Greg Thompson of the Omaha Police Department promised him that he would not be executed if he would provide information regarding the toxic substance he used to poison the victims. Harper claims that the district court erred in finding that Officer Thompson did not make such a promise.

The district court heard testimony from both Harper and Officer Thompson at the November 5, 1987, evidentiary hearing. It was for the district court to resolve any conflicts in the testimony, and we cannot say that the district court's findings on this issue are clearly erroneous. Accordingly, we reject Harper's contention on this issue.

### B

Harper contends that the district court erred in finding that statements he made on October 13, 1978, and January 8, 1979, were freely and rationally made. These statements incriminated Harper and provided the police with information concerning the toxic substance that he had used to poison the victims. On both dates, Harper's counsel had directed the police not to interrogate Harper, and Harper had repeatedly refused to make a statement without the presence of his attorney.

After a pretrial suppression hearing, the Nebraska trial court found that Harper's statements were taken in violation of *Mi-*

---

4. In *Clemons v. State,* 535 So.2d 1354 (Miss. 1988), *cert. granted,* —— U.S. ——, 109 S.Ct. 3184, 105 L.Ed.2d 693 (1989), the Mississippi Supreme Court affirmed the death sentence notwithstanding the invalidity of one of the aggravating circumstances in view of the fact that another valid aggravating circumstance remained. The United States Supreme Court recently heard argument in *Clemons* to consider the question left open in *Zant v. Stephens:* Whether an appellate court may affirm a capital sentence after voiding one of two aggravating factors found in the trial court, without ordering a reweighing by a jury. *Clemons v. Mississippi,* No. 88–6873; argued Nov. 28, 1989, 58 U.S.L.W. 3379–80.

*randa v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). It therefore concluded that the statements were inadmissible in the state's case-in-chief but would be admissible to impeach Harper.

■ The circumstances surrounding Harper's incriminating statements were developed at the November 5, 1987, evidentiary hearing. The district court found that Harper's statements, even though suppressed by the state district court before trial, were the product of a rational intellect and a free will and therefore could properly have been used for impeachment. As with the district court's findings on the alleged broken promise, we find no clear error in its findings here. We therefore affirm its factual determinations on this issue.

## C

■ Harper next contends that the district court erred by refusing to consider a claim based on *Estelle v. Smith.*[5] This claim alleged that because Harper's statements to the investigating officers regarding the toxic substance were illegally obtained, they were improperly considered by the trial court at sentencing.

Harper first challenged the trial court's use of these statements in his federal habeas petition. He did not raise this issue at his state post-conviction hearing and did not present it to the Nebraska Supreme Court.

The state argues that Harper's failure to raise the issue on direct appeal constituted a procedural default that bars federal habeas review under *Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977). *See* Neb.Rev.Stat. § 25–1919; Neb. Ct.R. of Prac. 9 D(1)(d) (supreme court will not consider an assignment of error unless assigned and discussed in appellant's brief). In *Wainwright,* the Supreme Court held that a federal habeas petitioner who has failed to comply with a state's procedural rule must show cause for the procedural default and prejudice attributable thereto

in order to obtain review of a defaulted constitutional claim. *Id.* at 87, 97 S.Ct. at 2506–07.

Harper claims that he did not present his claim at his post-conviction hearing or to the Nebraska Supreme Court because his counsel was ineffective. This alleged cause for the default, however, fails under *Smith v. Murray,* 477 U.S. 527, 106 S.Ct. 2661, 91 L.Ed.2d 434 (1986). In *Smith,* the defendant's counsel made a tactical decision on appeal to the state supreme court not to assign error to the trial court's admission of a psychiatrist's testimony. The defendant exhausted state remedies and then sought a writ of habeas corpus, alleging among other issues that the trial court erred in admitting the psychiatrist's testimony. The Supreme Court refused to consider the claim, holding that " 'the mere fact that counsel failed to recognize the factual or legal basis for a claim, or failed to raise the claim despite recognizing it, does not constitute cause for a procedural default.' " *Id.* at 535, 106 S.Ct. at 2666 (quoting *Murray v. Carrier,* 477 U.S. 478, 486–87, 106 S.Ct. 2639, 2644, 91 L.Ed.2d 397 (1986)).

Harper's trial counsel made a tactical decision to present as a mitigating circumstance Harper's statements regarding the toxic substance as proof of Harper's cooperation with the police officers. In fact, as the district court pointed out, Harper's current counsel stated in his petition for writ of certiorari that the strategy of emphasizing Harper's voluntary cooperation with the police was Harper's one plausible mitigating factor. *Harper v. Grammer,* 654 F.Supp. at 532. We can be sure that had trial counsel not offered this evidence as a mitigating circumstance, Harper would now be contending that counsel's failure to do so constituted ineffective assistance.

In the light of the tactical nature of Harper's counsel's decision, we cannot find that his actions present cause for default. In addition, the reasonableness of his deci-

---

5. In *Estelle v. Smith,* 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981), the United States Supreme Court held that statements that were

given in violation of the fifth amendment could not be considered at a capital sentencing proceeding.

sion precludes his performance from being labeled constitutionally deficient. *See Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). We thus affirm the district court's holding that this claim is barred from federal review. In any event, we agree with the district court that any error in submitting Harper's statements regarding his use of the toxic substance was harmless beyond a reasonable doubt.

### D

■ Harper next contends that the prosecution made an improper statement in closing argument that violated his right to due process. Harper claims that the prosecutor represented to the jury that Harper had deliberately withheld information that could have helped the victims. The prosecutor said, "[a]nother aspect of the thing is that whoever did this—It's—It's not a secret that these people are sick, and it's not a secret that people have died. All along, you know, the person that did it can do one thing. He can say, 'Yeah, the substance used was this, so I'm going to help * * *.'" At this point, the defense counsel moved for a mistrial. The court denied the motion, but instructed the jury to disregard the statement.

In determining whether the prosecutorial remarks demand a mistrial, "[t]he relevant question is whether the [prosecutor's] comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright*, 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974)). We do not believe that the prosecutor's statements, which were immediately stricken, infected the proceedings to a degree that would demand a mistrial. The record demonstrates that there was a vast amount of evidence indicating Harper's guilt. We do not believe that a brief allusion to the fact that Harper did not aid his victims following their poisoning so prejudiced the jury in its consideration of this evidence that the resulting conviction violated due process.

### E

■ Harper's next contentions allege that his counsel was ineffective by (1) failing to investigate an insanity defense and (2) failing to interpose an insanity plea over Harper's objection. To obtain relief on these ineffective assistance of counsel claims, Harper must show both that his counsel was incompetent and that he was prejudiced by this incompetence. *See Kimmelman v. Morrison*, 477 U.S. 365, 381, 106 S.Ct. 2574, 2585–86, 91 L.Ed.2d 305 (1986); *Walker v. Lockhart*, 852 F.2d 379, 381 (8th Cir.1988). The trial court thoroughly addressed both these contentions. After carefully reviewing the lower court's memorandum opinion and the record, we must agree with the district court that Harper's counsel did not act incompetently.

Harper's trial counsel considered raising an insanity defense for Harper. He reviewed the opinions of five mental health professionals, all of whom concluded that an insanity defense would be unsuccessful. After exercising independent and informed judgment, Harper's counsel concluded that Harper did not have a viable insanity defense under Nebraska law. We find that this conclusion was reasonable and that Harper's counsel's performance was therefore not deficient.

### F

■ Harper also contends that his counsel ineffectively assisted him in the sentencing phase of his trial. He bases this claim on counsel's failure to present testimony of police officers that would have confirmed Harper's sincere cooperation with police. As with the other ineffective assistance of counsel claims, we affirm the district court.

"The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington*, 466 U.S. 668, 686, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984).

At the post-conviction hearing, two officers testified that if they had been called to testify at the sentencing hearing, they would have testified that Harper cooperated to the best of his ability. Following a careful review of the record, we find that the absence of this testimony did not prejudice Harper. The sentencing court did consider Harper's admissions. The court, however, balanced this against the fact that Harper did not take any action when the information was essential to the survival of the victims. We agree with the district court that "[t]here is not the slightest chance that putting that testimony before the sentencing judge would have made a difference in the sentence. The findings of the judge were not contradicted in any way by what might have been the [officers'] testimony." *Harper v. Grammer,* 654 F.Supp. at 529–30.

### G

Harper next contends that the Nebraska trial court was under a duty to interpose an insanity plea over Harper's objections. This claim was first presented to the district court on habeas review. Harper alleges that the claim should not be barred from federal review because his trial and post-conviction counsel were ineffective.

As we discussed above, Harper's counsel considered presenting an insanity defense, but then made a professional judgment that such a defense would not succeed under Nebraska law. A natural element of this tactical decision would be not to assign error to the district court for coming to the same judgment. Because counsel's tactical decisions do not qualify as cause for procedural default, *see Smith,* 477 U.S. at 535, 106 S.Ct. at 2666–67, we consider this claim barred from federal review.

### H

■ Harper contends that he has a right under the sixth amendment to have a jury determine whether aggravating circumstances exist to justify his death penalty. The crux of his contention is that the aggravating circumstances determination is essentially an act of factfinding and there-fore is a function for the jury, not the court. The Court of Appeals for the Ninth Circuit has adopted this view, at least with respect to the Arizona death penalty statute. *Adamson v. Ricketts,* 865 F.2d 1011, 1023–29 (9th Cir.1988). As we see it, however, the United States Supreme Court has held otherwise.

In *Spaziano v. Florida,* 468 U.S. 447, 104 S.Ct. 3154, 82 L.Ed.2d 340 (1984), the jury initially recommended a life sentence. In accordance with Florida law, the judge then reexamined the aggravating and mitigating circumstances and entered a death sentence. The Supreme Court affirmed the court's sentence, noting that the sixth amendment does not require jury sentencing. *Id.* at 464, 104 S.Ct. at 3164. This holds true even where the sentence turns on specific findings of fact. *McMillan v. Pennsylvania,* 477 U.S. 79, 93, 106 S.Ct. 2411, 2420, 91 L.Ed.2d 67 (1986). If any doubt remained on that point following *Spaziano,* we believe that it was removed by the Court's recent opinion in *Hildwin v. Florida,* —— U.S. ——, 109 S.Ct. 2055, 2057, 104 L.Ed.2d 728 (1989) (per curiam), where the Court, in affirming the imposition of a death penalty based upon a finding by the trial judge, said:

> Like the visible possession of a firearm in *McMillan,* the existence of an aggravating factor here is not an element of the offense but instead is "a sentencing factor that comes into play only after the defendant has been found guilty." *Id.,* [477 U.S.] at 86, 106 S.Ct., at 2417. Accordingly, the Sixth Amendment does not require that the specific findings authorizing the imposition of the sentence of death be made by the jury.

We need not speculate whether *Adamson* will survive *Hildwin.* It is enough for us to say that the sixth amendment does not require the aggravating circumstances to be found by the jury under Nebraska's death penalty statute. We hold, therefore, that Harper's sixth amendment rights were not violated.

### I

We find that Harper's remaining contentions hold little merit. After careful re-

**484**

view of the record and the district court's memorandum opinion, we affirm the lower court's decision regarding these issues without further discussion.

## CONCLUSION

The district court's denial of the writ of habeas corpus is affirmed.